## CONNOLLY *v.* UNION SEWER PIPE COMPANY.

### ERROR TO THE CIRCUIT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 46.　Argued April 22, 23, 1901.—Decided March 10, 1902

If a claim is made in the Circuit Court that a state enactment is invalid under the Constitution of the United States, and that claim is sustained or rejected, this court may review the judgment, at the instance of the unsuccessful party.

If the alleged combination in this case was illegal, it would not follow that they could, at common law, refuse to pay for pipes bought for them under special contracts.

The contracts between the plaintiff and the respective defendants were collateral to the agreement between the plaintiff and other corporations, etc., whereby an illegal combination was formed for the sale of sewer pipe.

The first special defence in this case, based alone upon the principles of the common law, was properly overruled.

The special defence, based upon the act of Congress of July 2, 1890, 26 Stat. 209, was also properly rejected. That act does not declare illegal or void any sale made by such combination or its agents of property acquired for the purpose of being sold, such property not being at the time in the course of transportation from one State to another, or to a foreign country; and the buyer could not refuse to comply with his contract of purchase upon the ground that the seller was an illegal combination, which might be restrained or suppressed in the mode prescribed by the act of Congress.

THE case is stated in the opinion of the court.

*Mr. Henry D. Coghlan* for plaintiffs in error. *Mr. Joseph A. O'Donnell* was on his brief.

*Mr. Herbert Hamlin* and *Mr. Edwin Walker* for defendant in error.

Mr. Justice Harlan delivered the opinion of the court.

The Union Sewer Pipe Company—a corporation organized under the laws of Ohio and doing business in Illinois—brought its action against Thomas Connolly, a citizen of Illinois, in the Circuit Court of the United States for the Northern District of Illinois, on two negotiable promissory notes both executed at Chicago by the defendant; one, dated December 15, 1894, the other dated January 15, 1895, and each payable to the order of the plaintiff corporation ninety days after date at the First National Bank of Chicago.

These notes were given on account of the purchase by the defendant from the plaintiff of sewer pipe commonly known as standard Akron pipe, at prices agreed upon between the parties.

The Pipe Company also brought an action in the same court against William E. Dee, a citizen of Illinois, upon an open account for $2389.26, the value at agreed prices of certain pipe purchased by him from the plaintiff in June, 1896.    The plaintiff supplied the pipe under a written contract executed between it and the defendant in Illinois under date of August, 1895.

Each of the defendants filed a plea of the general issue, with notice of special defences and of set-off.

The special defences in each case were substantially the same. The notice in the Connolly case was that the defendant on the trial of the action would rely on these special matters:

" First. That the plaintiff is, and at all times since about the first day of January, 1893, has been a trust or combination of the capital, skill and acts of divers persons and corporations carrying on a commercial business in the States of Ohio and Illinois and between said States and elsewhere in the United States of America, and organized for the express purpose of unlawfully and contrary to the common law creating and carrying out restrictions in trade, to wit, in the trade of buying, selling and otherwise dealing in certain articles of merchandise, to wit, sewer and drainage pipes, and also for the express purpose of

unlawfully and contrary to the common law limiting the production of said articles of merchandise and increasing the market price thereof; and also for the express purpose of unlawfully and contrary to the common law preventing competition in the manufacture, making, transportation, sale or purchase of said articles of commerce; also for the express purpose of unlawfully and contrary to the common law fixing standards or figures whereby the prices of said articles of merchandise intended for sale, use and consumption in this State should be controlled and established; and also for the express purpose of unlawfully and contrary to the common law being a pretended agency whereby the sale of said articles of commerce should and might be covered up and made to appear to be for the original vendors thereof, and so as to enable the original vendors or manufacturers thereof to control the wholesale and retail price of such articles of commerce after the title thereto had passed from such vendors or manufacturers; and for the further express purpose of unlawfully and contrary to the common law making and entering into and carrying out a certain contract or certain contracts by which the several persons or corporations forming the plaintiff, or being the pretended stockholders thereof, to wit, have bound themselves not to sell, dispose of or transport said article of commerce below certain common standard figures or card or list prices in excess of the true market values thereof, and by which they have agreed to keep the prices of said articles of commerce at certain fixed or graduated figures, and by which they have established certain settled prices of said articles of commerce between themselves and others, so as to preclude a free and unrestricted competition among themselves and others in the sale and transportation of said articles of commerce, and by which they have agreed to pool, combine and unite any interests they may have in connection with the sale and transportation of said articles of commerce so that the prices thereof may effect advantageously to themselves; that all of the claims of the plaintiff against the defendant in this action arise wholly out of and are in respect of sales of said articles of merchandise made between the 1st day of January, A. D. 1893, and the 1st day of March, 1896, to this defendant by

the plaintiff in the ordinary course of its business as such a trust or combination acting as aforesaid, and that this action is brought to recover the alleged price thereof and for no other purpose.

" Secondly. That the plaintiff is and at all times since the 1st day of January, 1893, was a combination in the form of a trust, in restraint of trade and commerce among the several States, and doing business as such throughout the United States and between the States of Ohio and Illinois, contrary to the provisions of an act of Congress of date of July 2, 1890, and entitled ' An act to protect trade and commerce against unlawful restraints and monopolies,' and that this action is brought solely to recover the price of articles of merchandise, to wit, sewer and drainage pipes, sold to the defendant by the plaintiff, then and there acting and doing business as such a combination, as aforesaid, in violation of the provisions of said act.

" Thirdly. That the plaintiff is and at all times since the 1st of January, 1893, was a trust doing business as such in the State of Illinois and elsewhere, contrary to the provisions of an act of the legislature of the State of Illinois entitled ' An act to define trusts and conspiracies against trade, declaring contracts in violation of this provision void, and making certain acts and violations thereof misdemeanors, and prescribing punishment thereof and matters connected therewith, approved June 20, 1893, in force July 1, 1893 ; ' that this action is brought solely to recover the price of articles of merchandise, to wit, sewer and drainage pipes, sold to the defendant by the plaintiff, then and there acting and doing business in violation of the provisions of said act, and that the defendant hereby pleads said act in defence to this action and the whole thereof."

The set-offs claimed by Connolly were : Treble the amount of the actual damages sustained and allowed by the act of Congress of July 2, 1890, c. 647, known as the Sherman anti-trust act, $56,970.44 ; actual damages sustained by reason of the violation by the plaintiff of the provisions of the Illinois statute of July 1, 1893, $17,323.48 ; and for money had and received by plaintiff of defendant contrary to law, $17,323.48.

The set-offs claimed by Dee were of like character but of larger amounts.

Both cases were, by agreement, submitted to the same jury and were treated as one consolidated case. At the trial the defendants respectively asked leave to amend their notices of special defences, but leave was denied.

The Circuit Court disallowed both the first and second of the above special defences, and in respect of the third its decision was that the Illinois Trust statute of 1893 was in violation of the Constitution of the United States. It consequently directed the jury to find a verdict for the plaintiff in each case; in the Connolly case, for the amount of the two notes sued on; in the Dee case, for the amount of the plaintiff's open account against him. Verdicts having been returned as directed, and a motion for new trial in one case, and motions for new trial and in arrest of judgment in the other, having been overruled, judgments were entered on the verdicts.

1. The defendant in error insists that these cases should have gone to the Circuit Court of Appeals, and has moved on that ground that the writ of error be dismissed. The defence in each case was based in part on the Illinois statute of 1893. The plaintiff insisted at the trial that that statute was in violation of the Constitution of the United States, and its position was sustained by the Circuit Court. There have been suits in which the Circuit Court upon the claim of the defendant has applied the Constitution of the United States to the case before it and put the plaintiff out of court. Here, the plaintiff claimed that the state enactment upon which defendants relied was unconstitutional, and its position upon that point was sustained. In *Loeb* v. *Columbia Township Trustees*, 179 U. S. 472, 477, this court said: "The Circuit Court of Appeals Act does not declare that the final judgment of a Circuit Court in a case in which there was a claim of the repugnancy of a state statute to the Constitution of the United States may be reviewed here only upon writ of error sued out by the party making the claim. In other words, if a claim is made in the Circuit Court, no matter by which party, that a state enactment is invalid under the Constitution of the United States, and that claim is sustained or rejected, then it is consistent with the words of the act, and, we think, in harmony with its object, that this court

review the judgment at the instance of the unsuccessful party, whether plaintiff or defendant. It was the purpose of Congress to give opportunity to an unsuccessful litigant to come to this court directly from the Circuit Court in every case in which a claim is made that a state statute is in contravention of the Constitution of the United States." Upon the authority of that case, the motion to dismiss is denied.

2. The defendant Connolly purchased Akron sewer pipe from the plaintiff and for the agreed price thereof gave the two promissory notes upon which he was sued. The defendant Dee also purchased Akron sewer pipe at an agreed price as shown by the account upon which he was sued. Each defendant disputed his liability to the plaintiff upon the ground that prior to the making of the contracts with the defendants respectively for pipe, the plaintiff corporation entered into a combination with certain firms, corporations and companies engaged in Ohio in the manufacture of Akron pipe; which combination, it is alleged, was in illegal restraint of trade and therefore forbidden by the principles of the common law as recognized and enforced both in Ohio and Illinois.

The defence cannot be maintained. Assuming, as defendants contend, that the alleged combination was illegal if tested by the principles of the common law, still it would not follow that they could, at common law, refuse to pay for pipe bought by them under special contracts with the plaintiff. The illegality of such combination did not prevent the plaintiff corporation from selling pipe that it obtained from its constituent companies or either of them. It could pass a title by a sale to any one desiring to buy, and the buyer could not justify a refusal to pay for what he bought and received by proving that the seller had previously, in the prosecution of its business, entered into an illegal combination with others in reference generally to the sale of Akron pipe.

In *Strait* v. *National Harrow Co.*, 51 Fed. Rep. 819, a suit in which the plaintiffs sought a permanent injunction restraining the defendant from instituting or prosecuting any action against the plaintiffs for the infringement of letters patent owned by the defendant covering certain improvements in spring-tooth har-

rows, or from instituting or prosecuting any such suits against any person using the spring-tooth harrows manufactured by the plaintiffs, the court said: "In substance, the complaint shows that the defendant has entered into a combination with various other manufacturers of spring-tooth harrows for the purpose of acquiring a monopoly in this country in the manufacture and sale of the same, and, as an incident thereto, has acquired all the rights of the other manufacturers for the exclusive sale and manufacture of such harrows under patents, or interests in patents, owned by them respectively. Such a combination may be an odious and a wicked one, but the proposition that the plaintiffs, while infringing the rights vested in the defendant under letters patent of the United States, is entitled to stop the defendant from bringing or prosecuting any suit therefor because the defendant is an obnoxious corporation, and is seeking to perpetuate the monopoly which is conferred upon it by its title to the letters patent, is a novel one, and entirely unwarranted. The party having such a patent has a right to bring suit on it, not only against a manufacturer who infringes, but against dealers and users of the patented article, if he believes the patent is being infringed; and the motive which prompts him to sue·is not open to judicial inquiry, because, having a legal right to sue, it is immaterial whether his motives are good or bad, and he is not required to give his reasons for the attempt to assert his legal rights. 'The exercise of the legal right cannot be affected by the motive which controls it.' *Kiff* v. *Youmans*, 86 N. Y. 329."

In *National Distilling Co.* v. *Cream City Importing Co.*, 86 Wisconsin, 352, 355, which was an action to recover the price of goods sold and delivered, one of the defences was that the plaintiff was a member of an illegal trust or combination to interfere with the freedom of trade and commerce. The Supreme Court of Wisconsin said: "The first defence does not deny any allegation of the complaint, but the substance of it is that the sale and delivery of the goods in question to the defendant was void as against public policy, because the vendor was at the time a member of an unlawful trust or combination, formed to unlawfully interfere with the freedom of trade and com-

merce and in restraint thereof and to accomplish the ends therein set forth. . . . . Conceding, for the purposes of this case, that the trust or combination in question may be illegal and its members may be restrained from carrying out the purposes for which it was created by a court of equity in a suit on behalf of the public, or may be subject to indictment and punishment, there is, nevertheless, no allegation showing or tending to show that the contract of sale between the plaintiff and defendant was tainted with any illegality, or was contrary to public policy. The argument, if any the case admits of, is that, as the plaintiff was a member of the so-called 'trust,' or 'combination,' the defendant might voluntarily purchase the goods in question of it at any agreed price, and convert them to its own use, and be justified in a court of justice in its refusal to pay the plaintiff for them, because of the connection of the vendor with such trust or combination. The plaintiff's cause of action is in no legal sense dependent upon, or affected by the alleged illegality of the trust or combination, because the illegality, if any, is entirely collateral to the transaction in question, and the court is not called upon in this action to enforce any contract tainted with illegality, or contrary to public policy. The mere fact that the plaintiff is a member of a trust or combination, created with the intent and purposes set forth in the answer, will not disable or prevent it in law from selling goods within or affected by the provisions of such trust or combination, and recovering their price or value. It does not appear that it had stipulated to refrain from such transactions. A contrary doctrine would lead to most startling and dangerous consequences."

That case was cited with approval by the Circuit Court of Appeals for the Seventh Circuit in *Dennehy* v. *McNulta*, 86 Fed. Rep. 825, 827, 829. In that case the court said: "The mere fact that the corporation, as one of the contracting parties, may constitute an unjust monopoly, and that its general business is illegal—a status apparently held in *Distilling & Cattle Feeding Co.* v. *People*, 156 Illinois, 448—cannot serve, *ipso facto*, to create default or liability on its contracts generally; nor can such fact be invoked collaterally to affect in any

manner its independent contract obligations." Again: "In the case of an injurious combination of the nature asserted here, the remedy is by well recognized and direct proceedings; but one who voluntarily and knowingly deals with the parties so combined cannot, on the one hand, take the benefit of his bargain, and, on the other, have a right of action against the seller for the money paid, or any part of it, either upon the ground that the combination is illegal, or that its prices were unreasonable."

It is undoubtedly the general rule that a contract made in violation of a statute is void, and no recovery can be had upon it; as in *Embrey* v. *Johnson*, 131 U. S. 336, 348. That was an action upon a promissory note given in execution of a contract for the purchase of " future delivery " cotton, neither the purchase or delivery of actual cotton being contemplated by the parties, but the settlement in respect to which was to be on the basis of the " difference " between the contract price and the market price of cotton futures, according to the fluctuations in the market. The contract was held to be a wagering contract, and therefore illegal and void. As there could be no recovery upon the original agreement without disclosing the fact that it was illegal and one that could not, for that reason, be enforced or made the basis of a judgment, it was held, that attention could not be withdrawn from the illegality of the contract by the device of taking notes for the amount claimed under that contract. So, in *Miller* v. *Ammon*, 145 U. S. 421, 427. That was an action to recover the value of 1125 gallons of wines sold in Chicago by one who had not obtained a license to sell liquors at all—an ordinance of that city expressly declaring that no person, firm, or corporation should sell or offer for sale " any spirituous or vinous liquors in quantities of one gallon or more at a time, within the city, without having first obtained a license therefor," under a penalty of not less than $50 or more than $200 for each offence. It was held that the action could not be maintained, because " an act done in disobedience to the law creates no right of action which a court of justice will enforce." In that case the sale from which it was attempted to imply the promise of the buyer to pay for what

he received, was itself expressly forbidden by law under a penalty. The action there was upon the sale, and there was a direct connection between it and the purchase of the wines. So, again, in *McMullen* v. *Hoffman*, 174 U. S. 639, 654, after an extended review of the cases, American and English, the court said : " The authorities from the earliest time to the present unanimously held that no court will lend its assistance in any way toward carrying out the terms of an illegal contract."

In the present case other considerations must control. This is not an action to enforce or which involves the enforcement of the alleged arrangement or combination between the plaintiff corporation and other corporations, firms and companies in relation to the sale of Akron pipe. As already suggested, the plaintiff, even if part of a combination illegal at common law, was not for that reason forbidden to sell property it acquired or held for sale. The purchases by the defendants had no necessary or direct connection with the alleged illegal combination ; for the contracts between the defendants and the plaintiff could have been proven without any reference to the arrangement whereby the latter became an illegal combination. If, according to the principles of the common law, the Union Sewer Pipe Company could not have sold or passed title to any pipe it received and held for sale, because of an illegal arrangement previously made with other corporations, firms or companies, a different question would be presented. But we are aware of no decision to the effect that a sale similar to that made by the present plaintiff to the defendants respectively would in itself be illegal or void under the principles of the common law. The contracts between the plaintiff and the respective defendants were, in every sense, collateral to the alleged agreement between the plaintiff and other corporations, firms or associations whereby an illegal combination was formed for the sale of sewer pipe.

We are of opinion that the first special defence, based alone upon the principles of the common law, was properly overruled.

3. The special defence based upon the act of Congress of July 2, 1890, c. 647, 26 Stat. 209, was also properly rejected.

That act declares illegal "every contract, combination in form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations"—every person making any such contract or engaging in any such conspiracy being subject to a fine not exceeding $5000, or to imprisonment not exceeding one year, or to both punishments in the discretion of the court. § 1. So, every person monopolizing or attempting to monopolize, or combining or conspiring with any other person or persons to monopolize, any part of the trade or commerce among the several States or with foreign nations, is liable by that act to the like penalties in the discretion of the court. § 2. The several Circuit Courts of the United States are invested with jurisdiction to prevent and restrain violations of its provisions. § 4. Any property owned under any contract or by any combination or pursuant to any conspiracy (and being the subject thereof), and being in the course of transportation from one State to another, or to a foreign country, is subject to be forfeited, seized and condemned. § 6. By another section it is declared: "Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any Circuit Court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee." § 7.

Much of what has just been said in reference to the first special defence, based on the common law, is applicable to this part of the case. If the contract between the plaintiff corporation and the other named corporations, persons and companies, or the combination thereby formed, was illegal under the act of Congress, then all those, whether persons, corporations or associations, directly connected therewith, became subject to the penalties prescribed by Congress. But the act does not declare illegal or void any sale made by such combination, or by its agents, of property it acquired or which came into its possession for the purpose of being sold—such property not being at the

time in the course of transportation from one State to another or to a foreign country. The buyer could not refuse to comply with his contract of purchase upon the ground that the seller was an illegal combination which might be restrained or suppressed in the mode prescribed by the act of Congress; for Congress did not declare that a combination illegally formed under the act of 1890 should not, in the conduct of its business, become the owner of property which it might sell to whomsoever wished to buy it. So that there is no necessary legal connec-tion here between the sale of pipe to the defendants by the plaintiff corporation and the alleged arrangement made by it with other corporations, companies and firms. The contracts under which the pipe in question was sold were, as already said, collateral to the arrangement for the combination referred to, and this is not an action to enforce the terms of such arrangement. That combination may have been illegal, and yet the sale to the defendants was valid.

In the case of *The Charles E. Wisewall*, 74 Fed Rep. 802, which was a libel *in rem* by certain tug owners against a steam dredge to recover the value of certain services rendered by the tug in towing the dredges, it was sought to avoid payment for the services thus rendered upon the ground that the tug owners were members of an association which was illegal and void under the Sherman act. The court, assuming that the agreement by which the tugs acted in unison was prohibited by that act, said: " He [the claimant] should not be permitted to repudiate his just debts to the individual tugs because their association was illegal. Having asked for their services and having accepted the benefit thereof, he should pay. . . . An agreement by the tug Mayflower to tow the dredge Wisewall, for a reasonable sum, from Albany to Troy, is not void because the Mayflower is associated with other tugs to regulate the price of towing at Albany. Should the claimant purchase a pair of trousers at an Albany clothing shop, he would find it difficult to avoid paying their actual market price because the vendor and other tailors of that city had combined to keep up prices."

Nor can the defendants refuse to pay for what they bought upon the ground that the seventh section of the Sherman act

gives the right to any person " injured in his business or prop-
erty by any other person or corporation by reason of anything
forbidden or declared to be unlawful " by the act, to sue and
recover treble the damages sustained by him.  We shall not
now attempt to declare the full scope and meaning of that sec-
tion of the act of Congress.  It is sufficient to say that the ac-
tion which it authorizes must be a direct one, and the damages
claimed cannot be set off in these actions based upon special
contracts for the sale of pipe that have no direct connection
with the alleged arrangement or combination between the plain-
tiff and other corporations, firms or companies.  Such damages
cannot be said, as matter of law, to have directly grown out of
that arrangement or combination, and are, besides, unliquidated.
Besides, it is well settled in Illinois that " unliquidated damages
arising out of covenants, contracts or torts disconnected with
plaintiff's claim cannot be set off under the statute." *Robin-
son* v. *Hibbs*, 48 Ill. 408, 409, 410; *Hawks* v. *Lands*, 3 Gilm.
227, 232; *Hubbard* v. *Rogers*, 64 Ill. 434, 437; *Evans* v. *Hughey*,
76 Ill. 115, 120; *Clause* v. *Bullock Printing Press Co.*, 118 Ill.
612, 617; *Dushane* v. *Benedict*, 120 U. S. 630, 648.  If the act
of Congress expressly authorized one who purchased property
from a combination organized in violation of its provisions to
plead, in defence of a suit for the price, the illegal character of
the combination, that would present an entirely different ques-
tion.  But the act contains no such provision.

4. We come now to the consideration of the defence based
upon the Trust statute of Illinois of 1893.

As that statute is alleged to be repugnant to the Constitution
of the United States, and that its full scope may be seen, it is
here given in full:

" § 1. That a trust is a combination of capital, skill or acts
by two or more persons, firms, corporations or associations of
persons, or of two or more of them for either, any or all of the
following purposes: First—to create or carry out restrictions
in trade.  Second—to limit or reduce the production, or increase
or reduce the price of merchandise or commodities.  Third—to
prevent competition in manufacture, making, transportation,
sale or purchase of merchandise, produce or commodities.

Fourth—to fix at any standard or figure whereby its price to the public shall be in any manner controlled or established upon any article or commodity of merchandise, produce or manufacture intended for sale, use er consumption in this State; or to establish any pretended agency whereby the sale of any such article or commodity shall be covered up and made to appear to be for the original vendor, for a like purpose or purposes, and to enable such original vendor or manufacturer to control the wholesale or retail price of any such article or commodity after the title to such article or commodity shall have passed from such vendor or manufacturer. Fifth—to make or enter into, or examine or carry out any contract, obligation or agreement of any kind or description by which they shall bind or have bound themselves not to sell, dispose of or transport any article or commodity, or article of trade, use, merchandise, commerce or consumption below a common standard figure, or card or list price, or by which they shall agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of any article or commodity or transportation between them or themselves and others to preclude a free and unrestricted competition among themselves or others in the sale or transportation of any such article or commodity, or by which they shall agree to pool, combine or unite any interest they may have in connection with the sale or transportation of any such article or commodity that its price might in any manner be affected.

"§ 2. That any corporation holding a charter under the laws of this State which shall violate any of the provisions of this act shall thereby forfeit its charter and franchise, and its corporate existence shall cease and determine.

"§ 3. For a violation of any of the provisions of this act by any corporation mentioned herein it shall be the duty of the Attorney General or prosecuting attorney, upon his own motion, to institute suit or *quo warranto* proceedings, at any county in this State in which such corporation exists, does business or may have a domicile, for the forfeiture of its charter rights and franchise, and the dissolution of its corporate existence.

" § 4. Every foreign corporation violating any of the provisions of this act is hereby denied the right and prohibited from doing any business within this State, and it shall be the duty of the Attorney General to enforce this provision by injunction or other proper proceedings, in any county in which such foreign corporation does business, in the name of the State on his relation.

" § 5. Any violation of either or all of the provisions of section 1 of this act shall be and is hereby declared to be a conspiracy against trade, and a misdemeanor; and any person who may be or may become engaged in any such conspiracy or take part therein or aid or advise in its commission, or who shall, as principal, manager, director, agent, servant or employé, or in any other capacity, knowingly carry out any of the stipulations, purposes, prices, rates, orders thereunder, or in pursuance thereof, shall be punished by fine not less than two thousand dollars nor more than five thousand dollars.

" § 6. In any indictment or information for any offence named in this act, it is sufficient to state the purposes and effects of the trust or combination, and that the accused was a member of, acted with or in pursuance of it, without giving its name or description, or how or where it was created.

" § 7. In prosecutions under this act it shall be sufficient to prove that a trust or combination as defined herein exists, and that the defendant belonged to it or acted for or in connection with it, without proving all the members belonging to it, or proving or producing any article of agreement or any written instrument on which it may have been based, or that it was evidenced by any written instrument at all.

" § 8. That any contract or agreement in violation of the provisions of this act shall be absolutely void and not enforcible either in law or equity.

" § 9. The provisions of this act *shall not apply to agricultural products or live stock while in the hands of the producer or raiser.*

" § 10. Any purchaser of any article or commodity, from any person, firm, corporation or association of persons, or of two or more of them, transacting business contrary to any provision of the preceding sections of this act, shall not be liable for the

price or payment of such article or commodity and may plead this act as a defence to any suit for such price or payment." Laws, Ill. 1893, p. 182, act of June 20, 1893; Hurd's Rev. Stat. Ill. (1899), p. 618, title "Criminal Code."

Some reference was made to the act of the legislature of Illinois approved June 10, 1897, amending an act approved June 11, 1891, in force July 1, 1891, relating to the punishment of persons, partnerships or corporations forming pools, trusts and combines, and prescribing the mode of procedure and rules of evidence in such cases. The act of 1897 amended section one of the act of 1891 so as to read: "If any corporation organized under the laws of this or any other State or country for transacting or conducting any kind of business in this State, or any partnership or individual or other association of persons whosoever, shall create, enter into, become a member of or a party to any pool, trust, agreement, combination, confederation or understanding with any other corporation, partnership, individual or any other person or association of persons, to regulate or fix the price of any article of merchandise or commodity, or shall enter into, become a member of, or party to any pool, agreement, contract, combination, or confederation to fix or limit the amount or quantity of any article, commodity or merchandise to be manufactured, mined, produced or sold in this State, such corporation, partnership or individual or other association of persons shall be deemed and adjudicated guilty of a conspiracy to defraud, and be subject to indictment and punishment as provided in this act: provided, however, that in the mining, manufacture or production of articles of merchandise, the cost of which is mainly made up of wages, it shall not be unlawful for persons, firms or corporations doing business in this State to enter into joint arrangements of any sort, the principal object or effect of which is to maintain or increase wages." As this act of 1897 was passed after the date of the transactions here involved, it has nothing to do with the present case. Besides, the special defence was based on the act of 1893. The act of 1897 is referred to only as showing the exemption of another class from the operation of the general law relating to pools, trusts, combinations and confederations organ-

ized to regulate prices of articles, commodities and merchandise. Laws, Ill. 1897, c. 38, p. 153; Hurd's Revised Statutes of Illinois, pp. 615, 639.

That the arrangement or combination made between the Union Sewer Pipe Company and other companies, corporations and firms, created such a trust as the Illinois statute forbids is manifest from the evidence in the record. It is equally clear that if the plaintiff was an Illinois corporation, its charter could be forfeited and an end put to its corporate existence by proceedings instituted by the Attorney General of the State. §§ 1, 2 and 3. It is also clear that, if the statute is not altogether invalid the defendants could plead non-liability for the pipe purchased by them upon the ground that the plaintiff was, under the statute of Illinois, an illegal combination and the contracts which it made with the defendants were void. §§ 8, 10. The statute expressly authorizes such a defence. In that particular, the defence based upon the statute of Illinois differs from the other special defences.

The vital question, however, is whether the statute of Illinois of 1893 is not inconsistent with the Constitution of the United States, by reason of the fact that by the ninth section it declares that "the provisions of this act shall not apply to agricultural products or live stock while in the hands of producer or raiser." The Circuit Court held this section to be repugnant to the Fourteenth Amendment of the Constitution of the United States, and to be so connected and interwoven with other sections that its invalidity affected the entire act.

Looking specially at its provisions, it will be seen that, so far as the statute is concerned, two or more agriculturalists or two or more live stock raisers may, in respect of their products or live stock in hand, combine their capital, skill or acts for the purpose of creating or carrying out restrictions in the sale of such products or live stock; or limiting, increasing or reducing their price; or preventing competition in their sale or purchase; or fixing a standard or figure whereby the price thereof to the public may be controlled; or making contracts whereby they would become bound not to sell or dispose of such agricultural products or live stock below a common standard figure

or card or list price ; or establishing the price of such products or stock in hand, so as to preclude free and unrestricted competition among themselves or others ; or by agreeing to pool, combine or unite any interest they may have in connection with the sale or transportation of their products or live stock that the price might be affected. All this, so far as the statute is concerned, may be done by agriculturalists or live stock raisers in Illinois without subjecting them to the fine imposed by the statute. But exactly the same things, if done by two or more persons, firms, corporations or associations of persons, who shall have combined their capital, skill or acts, in respect of their property, merchandise or commodities held for sale or exchange, is made by the statute a public offence, and every principal, manager, director, agent, servant or employé knowingly carrying out the purposes, stipulations and orders of such combination is punishable by a fine of not less than two thousand nor more than five thousand dollars. Is not this such discrimination against those engaged in business (other than the sale of agricultural products and live stock in the hands of producers and raisers) as is forbidden by that clause of the Fourteenth Amendment which declares that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws ? "

By section 26 of a statute of Illinois it is provided : " Foreign corporations, and the officers and agents thereof, doing business in this State shall be subjected to all the liabilities, restrictions and duties that are or may be imposed upon associations of like character organized under the general laws of this State, and shall have no other or greater powers." 1 Starr & Curtis, 619. The contracts upon which these suits are based were made in Illinois. The purpose of the above statute was " to produce uniformity in the powers, liabilities, duties and restrictions of foreign and domestic corporations of like character and bring them all under the influence of the same law." *Stevens* v. *Pratt*, 101 Ill. 206 ; *Farmers' Loan and Trust Co.* v. *Lake St. Elevated R. R. Co.*, 173 Ill. 439. These matters are called to our attention as showing—as undoubtedly they do—that the Union Sewer Pipe Company, while doing business in Illinois, was subject to

the statute of Illinois concerning trusts or combinations, and which, in terms, applies to both domestic and foreign corporations. But the question remains to be decided whether the statute is repugnant to the Constitution of the United States. If it be, then it is not law and cannot be applied for the purpose of defeating the plaintiff's claims in these actions.

The question of constitutional law to which we have referred cannot be disposed of by saying that the statute in question may be referred to what are called the police powers of the State, which, as often stated by this court, were not included in the grants of power to the General Government, and therefore were reserved to the States when the Constitution was ordained. But as the Constitution of the United States is the supreme law of the land, anything in the Constitution or statutes of the States to the contrary notwithstanding, a statute of a State, even when avowedly enacted in the exercise of its police powers, must yield to that law. No right granted or secured by the Constitution of the United States can be impaired or destroyed by a state enactment, whatever may be the source from which the power to pass such enactment may have been derived. "The nullity of any act inconsistent with the Constitution is produced by the declaration that the Constitution is the supreme law." The State has undoubtedly the power, by appropriate legislation, to protect the public morals, the public health and the public safety, but if, by their necessary operation, its regulations looking to either of those ends amount to a denial to persons within its jurisdiction of the equal protection of the laws, they must be deemed unconstitutional and void. *Gibbons* v. *Ogden*, 9 Wheat. 1, 210; *Sinnot* v. *Davenport*, 22 How. 227, 243; *Missouri, Kansas & Texas Railway* v. *Haber*, 169 U. S. 613, 626.

What may be regarded as a denial of the equal protection of the laws is a question not always easily determined, as the decisions of this court and of the highest courts of the States will show. It is sometimes difficult to show that a state enactment, having its source in a power not controverted, infringes rights protected by the National Constitution. No rule can be formulated that will cover every case. But upon this general ques-

tion we have said that the guarantee of the equal protection of the laws means " that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and in like circumstances." *Missouri* v. *Lewis,* 101 U. S. 22, 31.   We have also said : " The Fourteenth Amendment, in declaring that no State ' shall deprive any person of life, liberty or property, without, due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,' undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights ; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property ; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts ; that no impediment should be interposed to the pursuits of any one except as applied to the same pursuits by others under like circumstances ; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition, and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offences." *Barbier* v. *Connolly,* 113 U. S. 27, 31.   This language was cited with approval in *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369, in which it was also said that " the equal protection of the laws is a pledge of the protection of equal laws." In *Hayes* v. *Missouri,* 120 U. S. 68, 71, we said that the Fourteenth Amendment required that all persons subject to legislation limited as to the objects to which it is directed, or by the territory within which it is to operate, " shall be treated alike, under like circumstances and considerations, both in the privileges conferred, and in the limitations imposed." " Due process of law and the equal protection of the laws," this court has said, " are secured, if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the

powers of government." *Duncan* v. *Missouri,* 152 U. S. 377, 382. Many other cases in this court are to the like effect.

These principles, applied to the case before us, condemn the statute of Illinois. We have seen that under that statute *all* except producers of agricultural commodities and raisers of live stock, who combine their capital, skill or acts for any of the purposes named in the act, may be punished as criminals, while agriculturalists and live stock raisers, in respect of their products or live stock in hand, are exempted from the operation of the statute, and may combine and do that which, if done by others, would be a crime against the State. The statute so provides notwithstanding persons engaged in trade or in the sale of merchandise and commodities, within the limits of a State, and agriculturalists and raisers of live stock, are all in the same general class, that is, they are all alike engaged in domestic trade, which is, of right, open to all, subject to such regulations, applicable alike to all in like conditions, as the State may legally prescribe.

The difficulty is not met by saying that, generally speaking, the State when enacting laws may, in its discretion, make a classification of persons, firms, corporations and associations, in order to subserve public objects. For this court has held that classification "must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis. . . . But arbitrary selection can never be justified by calling it classification. The equal protection demanded by the Fourteenth Amendment forbids this. . . . No duty rests more imperatively upon the courts than the enforcement of those constitutional provisions intended to secure that equality of rights which is the foundation of free government. . . . It is apparent that the mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the Fourteenth Amendment, and that in all cases it must appear not only that a classification has been made, but also that it is one based upon some reasonable ground—some difference which bears a just and proper relation to the attempted classification—and is not a mere ar-

bitrary selection." *Gulf, Colorado and Santa Fé Railway* v. *Ellis*, 165 U. S. 150, 155, 159, 160, 165. These principles were recognized and applied in *Cotting* v. *Kansas City Stock Yards Co.*, 183 U. S. 79, in which it was unanimously agreed that a statute of Kansas regulating the charges of a particular stock yards company in the State, but which exempted certain stock yards from its operation, was repugnant to the Fourteenth Amendment in that it denied to that company the equal protection of the laws.

Attention has been called to the cases of *Magoun* v. *Illinois Trust and Savings Bank*, 170 U. S. 283, and *American Sugar Refining Co.* v. *Louisiana*, 179 U. S. 89; and it is supposed that the grounds upon which the decision of the present case is placed are inconsistent with the principles announced in those cases. We do not think so.

In *Magoun* v. *Illinois Trust and Savings Bank* we held that the progressive inheritance tax law of Illinois of June 15, 1895, was not in conflict with the Constitution of the United States by reason of the fact that the amount of the tax was determinable by valuation so that every person and corporation should pay in proportion to the value of his, her or its property inherited. The classification made by the statute was held not to be arbitrary by reason of the fact that inheritances were classified according to amount, and each class taxed at a different rate; for it was based upon principles of equality between the members of each distinct class. Such classification was held not to be inconsistent with the Fourteenth Amendment.

In *American Sugar Refining Co.* v. *Louisiana*, we held that a statute of Louisiana exempting from its operation planters and farmers grinding and refining their own sugar and molasses, but which imposed a license tax upon persons and corporations carrying on the business of refining sugar and molasses, did not deny the equal protection of the laws to such persons and corporations as were thus taxed. It was as if the statute had imposed a tax upon the *business* of refining sugar and molasses, and had declared, as reasonably it might have done, that those who only refined their own sugar and molasses should not be regarded as belonging to that class. We said in that case:

·" The power of taxation under this provision was fully considered in *Bell's Gap Railroad Co.* v. *Pennsylvania,* 134 U. S. 232, in which it was said not to have been intended to prevent a State from changing its system of taxation in all proper and reasonable ways. It may, if it chooses, exempt certain classes of property altogether; may impose different specific taxes upon different trades or professions; may vary the rates of excise upon various products; may tax real and personal estate in a different manner; may tax visible property only and not securities; may allow or not allow deductions for indebtedness. 'All such regulations, and those of like character, so long as they proceed within reasonable limits and general usage, are within the discretion of the state legislature or the people of the State in framing their constitution.'" Again: "The discrimination is obviously intended as an encouragement to agriculture, and does not deny to persons and corporations engaged in a general refining business the equal protection of the laws."

The decision now rendered is not at all in conflict with the views expressed in the two cases just cited. It is sufficient to say that those cases had reference to the taxing power of the State, and involved considerations that could not, in the nature of things, apply to a state enactment like the one involved in the present case. The power to tax persons and property is an incident of sovereignty, and the extent to which it may be exerted has been indicated in numerous cases. Taxing laws, it has been well said, furnish the measure of every man's duty in support of the public burdens and the means of enforcing it. A tax may be imposed only upon certain callings and trades, for when the State exerts its power to tax, it is not bound to tax all pursuits or all property that may be legitimately taxed for governmental purposes. It would be an intolerable burden if a State could not tax any property or calling unless, at the same time, it taxed all property or all callings. Its discretion in such matters is very great and should be exercised solely with reference to the general welfare as involved in the necessity of taxation for the support of the State. A State may in its wisdom classify property for purposes of taxation, and the exercise of its discretion is not to be questioned in a court of the

United States, so long as the classification does not invade rights secured by the Constitution of the United States. But different considerations control when the State, by legislation, seeks to regulate the enjoyment of rights and the pursuit of callings connected with domestic trade. In prescribing regulations for the conduct of trade, it cannot divide those engaged in trade into classes and make criminals of one class if they do certain forbidden things, while allowing another and favored class engaged in the same domestic trade to do the same things with impunity. It is one thing to exert the power of taxation so as to meet the expenses of government, and at the same time, indirectly, to build up or protect particular interests or industries. It is quite a different thing for the State, under its general police power, to enter the domain of trade or commerce, and discriminate against some by declaring that particular classes within its jurisdiction shall be exempt from the operation of a general statute making it criminal to do certain things connected with domestic trade or commerce. Such a statute is not a legitimate exertion of the power of classification, rests upon no reasonable basis, is purely arbitrary, and plainly denies the equal protection of the laws to those against whom it discriminates.

We must not be understood by what has been said as conceding that the question of a denial of the equal protection of the laws can never arise under the taxing statutes of a State. On the contrary, the power to tax is so far limited that it cannot be used to impair or destroy rights that are given or secured by the supreme law of the land. We only need to say in this connection that the constitutional validity of the statute of Illinois now before us is not necessarily to be determined by the same principles that apply to taxing laws.

Other cases have been cited, but they are equally inapplicable in the present discussion, and only serve to show the extent to which the police powers of the States may be exerted without infringing the Federal Constitution.

Returning to the particular case before us, and repeating or summarizing some thoughts already expressed, it may be observed that if combinations of capital, skill or acts, in respect

of the sale or purchase of goods, merchandise or commodities, whereby such combinations may, for their benefit exclusively, control or establish prices, are hurtful to the public interests and should be suppressed, it is impossible to perceive why like combinations in respect of agricultural products and live stock are not also hurtful. Two or more engaged in selling dry goods, or groceries, or meats, or fuel, or clothing, or medicines, are, under the statute, criminals, and subject to a fine, if they combine their capital, skill or acts for the purpose of establishing, controlling, increasing or reducing prices, or of preventing free and unrestrained competition amongst themselves or others in the sale of their goods or merchandise; but their neighbors, who happen to be agriculturalists and live stock raisers, may make combinations of that character in reference to their grain or live stock without incurring the prescribed penalty. Under what rule of permissible classification can such legislation be sustained as consistent with the equal protection of the laws? It cannot be said that the exemption made by the ninth section of the statute was of slight consequence, as affecting the general public interested in domestic trade and entitled to be protected against combinations formed to control prices for their own benefit; for it cannot be disputed that agricultural products and live stock in Illinois constitute a very large part of the wealth and property of that State.

We conclude this part of the discussion by saying that to declare that some of the class engaged in domestic trade or commerce shall be deemed criminals if they violate the regulations prescribed by the State for the purpose of protecting the public against illegal combinations formed to destroy competition and to control prices, and that others of the same class shall not be bound to regard those regulations, but may combine their capital, skill or acts to destroy competition and to control prices for their special benefit, is so manifestly a denial of the equal protection of the laws that further or extended argument to establish that position would seem to be unnecessary.

We therefore hold that the act of 1893 is repugnant to the Constitution of the United States, unless its ninth section can be eliminated, leaving the rest of the act in operation.

MR. JUSTICE McKENNA, dissenting.

The principles applicable to such a question are well settled by the adjudications of this court. If different sections of a statute are independent of each other, that which is unconstitutional may be disregarded, and valid sections may stand and be enforced. But if an obnoxious section is of such import that the other sections without it would cause results not contemplated or desired by the legislature, then the entire statute must be held inoperative. The first section of the act here in question embraces by its terms *all* persons, firms, corporations or associations of persons who combine their capital, skill or acts for any of the purposes specified, while the ninth section declares that the statute shall not apply to agriculturalists or live stock dealers in respect of their products or stock in hand. If the latter section be eliminated as unconstitutional, then the act, if it stands, will apply to agriculturalists and live stock dealers. Those classes would in that way be reached and fined, when, evidently, the legislature intended that they should not be regarded as offending against the law even if they did combine their capital, skill or acts in respect of their products or stock in hand. Looking then at all the sections together, we must hold that the legislature would not have entered upon or continued the policy indicated by the statute unless agriculturalists and live stock dealers were excluded from its operation and thereby protected from prosecution. The result is that the statute must be regarded as an entirety, and in that view it must be adjudged to be unconstitutional as denying the equal protection of the laws to those within its jurisdiction who are not embraced by the ninth section.

Whether it is also within the prohibition against the deprivation of property without due process of law, is a question which it is unnecessary to consider at this time.

Perceiving no error in the record, the judgment in each case must be affirmed.

*Affirmed and it is so ordered.*

MR. JUSTICE McKENNA dissenting.

The trust statute of Illinois of 1893 is directed against com-

binations in trade made to affect prices of commodities. The court holds that the statute is repugnant to the Constitution of the United States because of the ninth section, which excludes from the operation of the statute "agricultural products or live stock while in the hands of the producer or raiser." In other words, and to present the discriminations of the statute in its application to persons, it punishes as a criminal conspiracy the acts enumerated in section one, except when they are done by producers and raisers of agricultural products and live stock in respect thereto. The statute also takes away a right of action for the price of the commodities sold. One of the defences of the plaintiffs in error was based on that provision.

The view of the court is that the legislation is purely discriminative and is not justified by any legal principle of classification. To sustain the view the rule expressed in *Gulf, Colorado & Santa Fé Railway* v. *Ellis*, 165 U. S. 150, is quoted. It was there said: "It is apparent that the mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the Fourteenth Amendment, and that in all cases it must appear, not only that a classification has been made, but also that it is one based upon some reasonable ground —some difference which bears a just and proper relation to the attempted classification—and is not a mere arbitrary selection." Undoubtedly. Without the observance of that principle, there can be no classification at all in any proper sense. There will be arbitrary grouping—not association of persons or things on account of common properties or characters or relations. But differences are recognized in classification as well as resemblances, and this court has found it necessary to so state. In *Atchison, Topeka & Santa Fé Railroad* v. *Matthews*, 174 U. S. 96, we said: "Indeed, the very idea of classification is that of inequality, so that it goes without saying that the fact of inequality in no manner determines the matter of constitutionality."

It seems like a contradiction to say that a law having inequality of operation may yet give equality of protection. Viewed rightly, however, the contradiction disappears; indeed, need not even be expressed. There are very few exertions of

MR. JUSTICE MCKENNA, dissenting.

government which can be made applicable to all persons as such. Government is not a simple thing. It encounters and must deal with the problems which come from persons in an infinite variety of relations. Classification is the recognition of those relations, and in making it a legislature must be allowed a wide latitude of discretion and judgment. This has been decided many times against contentions based on a variety of facts. I will content myself by citing the later cases and commenting upon them very briefly. The cases are *Magoun* v. *Illinois Trust &c. Bank*, 170 U. S. 283; *Clark* v. *Kansas City*, 176 U. S. 114; *Gundling* v. *Chicago*, 177 U. S. 183; *Petit* v. *Minnesota*, 177 U. S. 164; *Williams* v. *Fears*, 179 U. S. 270; *American Sugar Refining Company* v. *Louisiana*, 179 U. S. 89.

In these cases and the cases cited in them classifications were sustained which depended upon differences in the amounts of legacies; on differences between corporations; on differences between land dependent on its use for agriculture and other purposes in regard to the power of a city to annex it; on differences between fire insurance and other insurance; on the right of a legislature to declare as a matter of law that the work of a barber was not a work of necessity, while as to all other kinds of labor the fact was to be determined by a jury; on the difference between hiring persons to labor in the State and hiring persons to labor out of the State; on differences between sugar refiners based entirely and only on the fact of the production or purchase of the sugar refined.

In *American Sugar Refining Co.* v. *Louisiana*, a license tax was imposed on those engaged in carrying on the business of refining sugar and molasses. It was provided, however, that the law should not apply to "planters and farmers grinding and refining their own sugar."

Wherein did the Louisiana statute, which was held constitutional, differ from the Illinois statute, which is held to be unconstitutional? In the former case the distinction (in the opinion in the case it is called "discrimination") was between manufacturers of sugar and growers of it. In the case at bar the distinction is between traders in products and growers of them. Is not a parallel obvious? Can the cases be distinguished because

in one a tax was imposed and in the other conduct is regulated or penalized? Indeed, is not the distinction verbal, each being means to an end? Besides, what justification for the distinction is there under the Constitution? None, I submit, can be found in the words of that instrument. Any state legislation which denies the equal protection of the laws is prohibited. The prohibition is independent of form or means. It would be strange, indeed, if the power of a State is limited and confined by the Constitution of the United States, when the State attempts by law to regulate conduct, and is unbounded in its discretion when it imposes taxes; that in one case it may see a difference between manufacturers and planters, and in the other case may not see a difference between traders in commodities acquired for the purposes of sale and such property when held by farmers by whose labor they were produced.

The reasoning of the cases is as strong and demonstrative as their instances. We have declared that we could not investigate or condemn the impolicy of a state law, and that this court is not a refuge from the mere injustice and oppression of state legislation.. Many of the exercises of government, it has been pointed out, were addressed to persons, not absolutely or abstractly, but according to their relations, and that classification, based on those relations, need not be constituted by an exact or scientific exclusion or inclusion of persons or things. Therefore, it has been repeatedly declared that classification is justified, if it is not palpably arbitrary.

The cases afford not only affirmative examples but also by a negative deduction illustrate what is legal classification. Mr. Justice Bradley said in *Bell's Gap Railroad* v. *Pennsylvania*, 134 U. S. 232: "Clear and hostile demonstrations against particular persons and classes, especially such as are of unusual character, unknown to the practice of our government, might be obnoxious to the constitutional prohibition." That is, the prohibition upon the States to deny to any citizen the equal protection of the laws. The thought of Mr. Justice Bradley was developed and illustrated by Mr. Justice Brown, speaking for this court in *American Sugar Refining Co.* v. *Louisiana*, and tests of the unconstitutionality of the discriminations of a state law

were expressed, which were as ready as they were significant. Speaking of the Louisiana act, which discriminated between refiners of sugar, Mr. Justice Brown said : " The act in question does undoubtedly discriminate in favor of a certain class of refiners, but discrimination, if founded upon a reasonable distinction in principle, is valid.   Of course, if such discrimination were purely *arbitrary, oppressive or capricious* (the italics are mine), and made to depend upon differences of color, race, nativity, religious opinions, political affiliations, or other considerations having no possible connection with the duties of citizens as taxpayers, such exemption would be pure favoritism, and a denial of the equal protection of the laws to the less favored classes."

Of course, the enumeration of some tests does not exclude others, but why the enumeration of the special kind ?   Did not the case require it ?   What ingenuity can find a difference in the act and process of sugar refining when done by a purchaser of raw sugar and a raiser (planter) of it ; what difference in the product after it shall be refined, or in any element, thing or circumstance, which can affect its use or sale.   The whole and only distinction in the classes which the statute made was between the grower of sugar and the buyer of it—the exact and only distinction of the Illinois law now held to be void, and yet the Louisiana law was sustained as constitutional.

I have already adverted to the distinction which may be claimed to exist between taxing laws and regulating laws, but a few words more may be justified.   The opinion of the court makes a great deal of the penal provisions of the trust law, and its discriminations are displayed and intensified more by the recitation and effect of those provisions than by the provision upon which the defence of plaintiffs in error was based, that is, the provision (sec. 10) which precludes recovery of the price of "any article or commodity sold " by an offender against the statute.

The penal provisions of the statute are not before us for judgment.   If they were, and the unconstitutionality of the statute could be attributed to them, they might be construed as separable and be discarded.   But, not insisting on that, and consider-

ing the comments on those provisions to be more than incidental illustration of the character of the statute, it is very clear to me that they do not in any way affect the power of the State.   In other words, the power of the State cannot be impugned or affected by the sanctions which the State may impose to secure obedience to its commands or prohibitions.   It may be through a tax or it may be through penalties, and the question will always be, is the thing which is directed or forbidden within the power of the State?   And when a statute is assailed as denying the equal protection of the laws its equal operation is only involved.

The principle of classification, therefore, is not different in tax laws than in other laws.   That principle, as I have said, necessarily implies discrimination between the persons composing the class and other persons.   The equality prescribed by the Constitution is fulfilled if equality be observed between the members of the class.   It is violated if such equality be not observed, and the latter was the case in *Cotting* v. *Kansas City Stock Yards Co.*, 183 U. S. 79.   That case, therefore, does not sustain the ruling now made.

Any further remarks may be only repetition, but the application of the cases to the statute now before us should be pointed out.

The equality of operation which the Constitution requires in state legislation cannot be construed, as we have seen, as demanding an absolute universality of operation, having no regard to the different capabilities, conditions and relations of men. Classification, therefore, is necessary, but what are its limits? They are not easily defined, but the purview of the legislation should be regarded.   A line must not be drawn which includes arbitrarily some persons who do and some persons who do not stand in the same relation to the purpose of the legislation. But a wide latitude of selection must be left to the legislature. It is only a palpable abuse of the power of selection which can be judicially reviewed, and the right of review is so delicate that even in its best exercises it may lead to challenge.   At times, indeed, it must be exercised, but should always be exercised in view of the function and necessarily large powers of a legislature.

Mr. Justice McKenna, dissenting.

What was the purpose of the Illinois statute, and what were the relations of its classes to that purpose? The statute was the expression of the purpose of the State to suppress combinations to control the prices of commodities, not, however, in -the hands of the producers, but in the hands of traders, persons or corporations. Shall we say that such suppression must be universal or not at all? How can we? What knowledge have we of the condition in Illinois which invoked the legislation, or in what form and extent the evil of combinations to control prices appeared in that State? Indeed, whether such combinations are evils or blessings, or to what extent either, is not a judicial inquiry. If we can assume them to be evil because the statute does so, can we go beyond the statute and determine for ourselves the local conditions and condemn the legislation dependent thereon? But are there not, between the classes which the statute makes, distinctions which the legislature had a right to consider? Of whom are the classes composed? The excluded class is composed of farmers and stockraisers while holding the products or live stock produced or raised by them. The included class is composed of merchants, traders, manufacturers, all engaged in commercial transactions. That is, one class is composed of persons who are scattered on farms; the other class is composed of persons congregated in cities and towns, not only of natural persons but of corporate organizations. In the difference of these situations, and in other differences which will occur to any reflection, might not the legislature see difference in opportunities and powers between the classes in regard to the prohibited acts? That differences exist cannot be denied. To describe and contrast them might be invidious. To consider their effect would take us from legal problems to economic ones, and this demonstrates to my mind how essentially any judgment or action, based upon those differences, is legislative and cannot be reviewed by the judiciary.

I am, therefore, constrained to dissent from the judgment of the court.

Mr. Justice Gray took no part in the decision of this case.