Commonwealth *v.* Taber et al., Appellants.

Argued September 15, 1958. Before Rhodes, P. J., Hirt, Gunther, Wright, Woodside, Ervin, and Watkins, JJ.

*Martin D. O'Malley,* for appellants.

*Robert G. Dean,* District Attorney, for appellee.

OPINION PER CURIAM, November 14, 1958:

The judgment of sentence of the court below in each case is affirmed on the opinion of Judge BODIE, specially presiding in the Court of Quarter Sessions of Susquehanna County, as reported in 14 Pa. D. & C. 2d 591.

---

DISSENTING OPINION BY GUNTHER, J.:

Earl Taber, defendant, was convicted for violation of the penal provision of the so-called "blue laws" of this Commonwealth, the Act of 1939, June 24, P. L. 872, section 699.4. This provision is substantially the same as that contained in the Act of 1794, April 22, 3 Smith Laws 177, section 1, which, in turn, were substantial reenactments of the Act of 1786, September 25, which succeed the Act of 1779, March 14, entitled "An Act for the suppression of vice and immorality." The Act of 1939 provides in part as follows:

"Whoever does or performs any worldly employment or business whatsoever on the Lord's day, com-

monly called Sunday (works of necessity and charity only excepted), or uses or practices any game, hunting, shooting, sport or diversion whatsoever on the same day not authorized by law, shall, upon conviction thereof in a summary proceeding, be sentenced to pay a fine of four dollars ($4), for the use of the Commonwealth, or, in default of the payment thereof, shall suffer six (6) days' imprisonment."

Sometime prior to November 17, 1957, there appeared notices of a "turkey shoot" on the Frigner farm in Jackson Township, Susquehanna County, sponsored by the Lakeview Rod and Gun Club, Kenneth Hoal, Chairman. On November 17, 1957, Frederick Hoal, a brother of Kenneth Hoal, went to the farm about one o'clock p.m., and talked with Kenneth Hoal and the defendant, Earl Taber, and asked them to stop the turkey shoot as it was against the law. He returned later and observed the defendant and Kenneth Hoal shooting at targets and estimated that approximately sixty people were on the farm. Frederick Hoal thereafter appeared before a justice of the peace and filed information against defendant, alleging violation of the Sunday Laws. From a summary conviction, both defendant and Kenneth Hoal took separate appeals to the court below and both were found guilty as charged.

The act here involved does not come under the hunting or shooting at turkeys; on the contrary, it is conceded by all that the "turkey shoot" here engaged in is a contest where the participants shoot at targets and the winners, for their skills, are rewarded with a turkey as a prize. If, therefore, the defendant was guilty of anything, he was guilty of shooting at a target out in the open countryside in competition with others similarly interested in the harmless sport or relaxation of target shooting.

The opinion of the court below, which the majority of this court affirms without opinion, rests solely on the ground that the language of the Act in question prohibits the act of the defendant, and, therefore, he is guilty. The majority of this court must concede that while the language of a statute may not be changed, its application to any given situation may change as circumstances and conditions change. This is a broad principle not only of statutory construction but also of constitutional law construction which courts have employed on occasions too numerable to mention. However, in the consideration of the problem raised by this appeal, the majority ignores the consideration or discussion of the changing conditions of our complex society which may well affect the outcome or proper evaluation of the principles involved. Instead, the majority prefers to place its stamp of approval on the bare conclusion of the court below that a "turkey shoot," in which the defendant participated, is a shooting mentioned in the so-called blue law and is prohibited. The defendant, therefore, is guilty. I cannot bury my head in the ancient sand of time and reach this conclusion, especially when the object sought to be accomplished is considered.

The title to the Act of 1794 is, "An Act for the prevention of vice and immorality, and of unlawful gaming, and to restrain disorderly sports and dissipation." It may be pointed out here that, contrary to the opinion of the court below which the majority of this court affirms, "game" or "gaming" as thus used in the title, does not mean playing games, but "gambling". This term has been defined innumerable times by this court, and the terms "gaming" and "gambling" are still synonymous in the dictionaries. The Act of 1779, March 14 (Statutes at Large of Pennsylvania, Vol. IX, page 333) was entitled, "An Act for the suppression

of vice and immorality," and began with the preamble, "Whereas sufficient provision hath not hitherto been made by law for the due observation of the Lord's Day, commonly called Sunday, and the preventing of profane swearing, cursing, drunkenness, cock fighting, bullet playing, horse racing, shooting matches, and the playing or gaming for money, or other valuable things, fighting of duels and such evil practices, which tend greatly to debauch the minds and corrupt the morals of the subjects of this commonwealth."

Originally, the statute was sustained by our courts on constitutional grounds by assertions that Christianity is part of the common law of this State. The difficulty with this argument is that no definition of Christianity could be promulgated which would have satisfied all those who profess that faith. See *Updegraph v. Commonwealth,* 11 S. & R. 394; *Johnston v. Commonwealth,* 22 Pa. 102; *Commonwealth v. American Baseball Club of Philadelphia,* 290 Pa. 136, 138 A. 497. This argument overlooked the Seventh Day Christian Churches, for example, and raised serious doubts concerning those not adhering to the Christian faith. See Article I, section 3 and 4 of the Pennsylvania Constitution. This reasoning gave way to the theory that the statute was a purely civil regulation and a proper exercise of the police power. See *Specht v. Commonwealth,* 8 Pa. 312; *Sparhawk v. Union Passenger Railroad Company,* 54 Pa. 401; *Commonwealth v. Grochowiak,* 184 Pa. Superior Ct. 522, 136 A. 2d 145. This police power is primarily based on the proposition that the designation of Sunday as a day of rest is aimed to enforce a cessation from labor on one day in seven and to protect citizens in the enjoyment of repose, rest and relaxation and, therefore, to promote the health, peace, good order and morality of society. *Specht v. Commonwealth,* supra; *Soon*

*Hing v. Crowley,* 113 U. S. 703, 710, 28 L. Ed. 1145, 5 S. Ct. 730.

The basic problem involved under the Act in question is whether it should receive a strict or liberal construction. This consideration and its application produce results as far apart as the north and south poles. If the statute is viewed under the literal and strict construction theory, being penal in nature, such construction should apply with equal force on all phases of our activity, all segments of our society and to every person, natural or artificial. Consequently, law enforcement agencies of our Commonwealth should vigorously prosecute all violations. Open disdain for the law through lack of enforcement should not be tolerated, and no law enforcement officer can be permitted to select violations which will be prosecuted and those which will be sanctioned. Farmers should be prosecuted for selling their wares on Sunday in markets or on the roadsides of this Commonwealth. All industrial establishments, including the labor force utilized by them, should be prosecuted for employment and operation on Sunday, excepting only that portion which is required for strict maintenance. Businessmen and commercial houses of all description are not outside the pale of the law, and the huge transportation industry should not be permitted to operate except those which are specifically exempt from the law. Innumerable sporting and recreational activities, picnics, expositions, fairs and amusement parks should be closed as being in violation of the law. However, baseball, football, tennis, motion pictures, polo, fishing, the removal of raccoons and fur-bearing animals caught in hunting traps or deadfalls, the registration of voters and the consumption of liquor in private clubs should be permitted because the legislature has exempted these activities from the operation of the so-

called blue laws. Under this strict and liberal construction theory, the "turkey shoot" involved in the present appeal may properly be sustained as a recreation or sporting activity prohibited by law. Even administrative, official or judicial proceedings conducted on Sunday could be considered as violations of the law. See collected cases in 26 A.L.R. 2d 996.

It is readily apparent that such strict and literal construction of the Act in question would produce chaos in present day society. I do not concede that such literal and strict construction of the statute is necessary or even contemplated by the framers of the Act. As stated by Mr. Justice SUTHERLAND in *Village of Euclid v. Ambler Realty Co.*, 272 U. S. 365, 71 L. Ed. 303, 47 Supreme Ct. 114: "Regulations, the wisdom, necessity and validity of which, as applied to existing conditions are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive . . . . And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation." The reverse of this proposition is equally true.

The Act of 1794, from which the Act of 1939, supra, was taken, should receive a liberal construction. The concepts of the life under the atomic power age should not be confused with the concepts of the horse-drawn carriage age. The work, transportation, recreation and relaxation of the 18th century cannot be compared with that of the present age. What may then have been considered as evil practices or acts which "debauch the minds and corrupt the morals of this commonwealth" are accepted today as perfectly prop-

er. What may have been considered as non-essential wordly employment of that day may well be considered employment of necessity today. Some sports and relaxations engaged in today definitely would have been considered as immoral in the 18th century either because of the activity involved or the attire used. For example, would anyone question the bathing attire of today as being stamped as immoral in 1794? Would modern dancing have been considered as debauching the mind and corrupting the morals?

Whatever reasons may have been attributed to upholding the Act on the basis of employment on Sunday cannot be considered as valid when sports, relaxation and diversions from employment of the type here involved is considered. It is difficult to see why certain sports and amusements may be barred while others are sanctioned. From a physical point of view, it seems more desirable and beneficial to engage in some innocent recreation on Sunday than to spend the day in enforced idleness or only in those activities specifically permitted as exceptions to the general prohibition. A reasonable interpretation of the original enactment, however, does not lead to such incongruous conclusion. The act forbids the practice of any unlawful (not authorized by law) game, hunting, shooting, sport or diversion whatsoever on Sunday. The proper construction of this clause, when considered with the rest of the original Act, leads to the conclusion that the word "unlawful" modifies or qualifies every subject mentioned in it. If a statute speaks of "any unlawful act, practice, scheme or device", the word "unlawful" applies to all of the nouns. The adjective applies to all the subjects following it, and it penalizes only such games, hunting, shooting, sports or diversions whatsoever as are *unlawful*. Section V of the Act of 1794 forbade cock-fighting for money and pro-

moting and encouraging cock-fighting by betting thereon; bullet playing for money or other valuable thing (not bullet playing, but bullet playing for money—that is, gambling) ; the playing of cards, dice, billiards, bowls, shuffle boards, or any game of hazard or address, for money, or other valuable thing. Again, it will be noted, the thing forbidden is the gambling, not the sport itself. The penalty for doing any of the above acts was $3.00, but for doing the same things on Sunday, the penalty was $4.00. It also imposed a penalty of $20.00 on any person who "shall enter, start, or run any horse, mare, or gelding, for any plate, prize, wager, bet, sum of money or other valuable thing." These, then, were the "unlawful" games or sports which were declared so regardless whether engaged in on Sunday or at any other time. Shooting was never declared to be unlawful on any other day but Sunday but even then, it was shooting in connection with *gambling or wagering for money.* The majority of this court, for the first time, has declared the innocent act of discharging a rifle, revolver or shotgun or, more specifically, a "turkey shoot" as a violation of the law! What is so horribly wrong with discharging a gun on a farm where no one is disturbed, in connection with a sporting activity conducted by a gun club? Must I play tennis or polo instead?

It could be further reasoned that the persons who arranged the "turkey shoot" were engaged in worldly employment which is prohibited. Any attempt to enforce the law on such arbitrary classification would only invite further legal concern, for then we would not be concerned with the vexing problem of discriminatory classification *in the enactment of the statute* but, rather, *in the discriminatory enforcement or the equality of operation* of said enactment. The equality of enforcement under a statute may be just as objec-

tionable, in a constitutional sense, as the arbitrary discrimination in the enactment. The guarantee of equal protection of the laws mean that no person or class of persons shall be denied the same protection of the law which is enjoyed by other persons or other classes in the same place and in like circumstances. *Connolly v. Union Sewer Pipe Co.*, 184 U. S. 540, 559, 46 L. Ed. 679, 22 S. Ct. 431; *Missouri v. Lewis*, 101 U. S. 22, 31, 25 L. Ed. 989. Equal protection of the law is secured if the law operates on all alike, and does not subject the individual to an arbitrary exercise of the powers of government in enforcing the law as to some and passive condonation as to others. *Yick Wo v. Hopkins*, 118 U. S. 356, 30 L. Ed. 220, 6 S. Ct. 1064.

The action of the majority of this court, without opinion, is based upon a mere conclusion of the court below which I consider unsound, archaic and as making an act illegal on a particular day of the week which is perfectly proper on any other day. I therefore dissent and would reverse the court below.

WATKINS, J., joins in this dissenting opinion.