# Owen County Burley Tobacco Society v. Brumback

Motion heard by the whole court except CHIEF JUSTICE O'REAR—Motion overruled.

1.  Cost—Bond—Statutory Provisions—Consideration of Motion to Issue Injunction.—Civ. Code Prac. section 617, provides that an action by a corporation, other than a bank created by the State laws, shall be dismissed upon· motion by the defendant, unless a bond to secure payment of costs is filed within a reasonable time, allowed by the court, after motion made. In an injunction proceeding by a corporation a motion for cost bond was filed by defendant. Held, that the question of the execution of the bond did not properly come before the court in disposing of the motion to issue the injunction.
2.  Pleading—Petition—Requisites—Name on Pleading.—Failure to style a petition for injunction a "petition in equity" is no cause for dismissal, since under Civ. Code Prac. section 10, it may be transferred to the proper docket during court.
3.  Injunction—Notice.—Where defendant is· present and heard by counsel on the question of whether an injunction should be issued, the sufficiency of notice need not be considered.
4.  Same—Temporary Injunction—Scope of Inquiry.—On an application for temporary injunction, the only matter for consideration is whether or not the statements in the verified petition alone, or in connection with the affidavits filed with

it, show such a condition as would authorize the relief sought.

5. Same—Sufficiency of Application.—A petition for injunction, supported by affidavits, alleged that plaintiff was a corporation organized under the State laws, engaged in the business of handling and selling tobacco for growers who had placed their tobacco in plaintiff's possession for those purposes; that defendant signed an agreement pledging his 1907 crop of tobacco to plaintiff, and agreed with it and the members of its board of control, and with other growers and owners of tobacco, that the society should hold his tobacco in common with other tobacco and sell the same when placed in pool with tobacco grown and owned by other persons; that defendant has prized and shipped a part of his 1907 crop, and is now prizing and preparing to ship the whole of the crop and that, if permitted to ship and sell the same, it will work an irreparable injury to plaintiff and all poolers of tobacco. The petition was controverted by affidavits of defendant. Held, that it sufficiently appeared that there was no adequate remedy at law, and that plaintiff was entitled to the injunction, if the contract was enforceable, for the damages for breach of the contract could not be estimated, and failure to observe the agreement would work a dissolution of the society, and, though the benefits of the agreement were not shown, it would be presumed to be of some benefit.

6. Constitutional Law — Special Privileges — Statute Legalizing Pooling of Farm Products.—Acts 1906, p. 429, c. 117, legalizes the pooling of tobacco and other farm products for the purpose of classifying, grading, and selling the same, in order that a higher price may be obtained therefor than could be received by selling the crops individually, and authorizes parties forming the pool to select agents to hold the crops pooled for the purpose of classifying, grading, and selling them. Held, that Bill of Rights, section 3, declaring that no grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men, except in consideration of public service, does not deny the Legislature the right to select and classify persons or occupations or the right to enact reasonable laws for the government of each class that it deals with, and that the law does not grant any exclusive, separate public emoluments or privileges within the meaning of the Bill of Rights, but simply selects a class and specifically provides what it may do, without withholding the privilege from others, and, so far as it affects a member of the class selected, it does not violate the Bill of Rights.

7. Same—Privileges and Immunities—Equal Protection of Laws.

Owen County Burley Tobacco Society v. Brumback.

—The law of 1906 (Acts 1906, p. 429, c. 117) does not violate Const. U. S. Amend. 14, providing that no State shall make or enforce any law which shall abridge the privilege or immunities of citizens of the United States, nor deny to any person within its jurisdiction the equal protection of the law; for the amendment does not deny the State the right to classify and select occupations, trades and professions, nor does it prohibit the State from granting rights or conferring privileges on persons or classes, but only declares that, when rights or privileges are conferred, all persons and classes that may be fairly included within the scope of the law granting the privileges or immunities shall have the benefit of them, whether so intended or not, and the act does not in terms discriminate against any other person or class of persons.

8. Same—Effect of Exclusive Privileges.—If the law of 1906 (Acts 1906, p. 429, c. 117) granted exclusive privileges to the class affected, it would violate not only Bill of Rights, section 3, but Const. U. S. Amend. 14.

9. Same—Persons Entitled to Complain.—If the act was discriminatory, that question could not be raised by a member of the class affected, since he has not been discriminated against, nor denied any privilege or immunity, nor the equal protection of the law.

10. Monopolies—Constitutional Provisions—Construction.—Const. section 198, providing that it shall be the duty of the General Assembly to enact such laws as may be necessary to prevent all trusts, pools, etc., from combining to depreciate below its real value any article, or to enhance the cost of any article above its real value, does not prohibit trusts, pools, or combinations, nor does it command the General Assembly to enact laws forbidding them, but leaves it to the Assembly to determine the need of future legislation on the question; and it is only trusts, pools, etc., created for the purpose of depreciating an article below its real value or enhancing its cost above its real value that are forbidden, and hence the Legislature may legalize pools and combinations created or organized for the purpose of obtaining fair and remunerative prices.

11. Same—Statutory Provisions.—Acts 1906, p. 429, c. 117, in allowing a class of persons to make contracts with each other, the extent of which is to pool and combine their tobacco or other farm products, and to select an agent to handle, hold, and sell such pooled crops, to obtain higher prices than could be received by selling the crops individually, does not violate

Const. section 198, for it does not authorize a pool to enhance the cost of crops above their real value, but was simply intended to enable the class affected to meet the trusts that controlled the markets in which the former was forced to sell, and to place him on such a footing that he might secure a fair and reasonable price for his crops.

12. Contracts — Pooling Contracts—Validity — Object—Statutory Provisions.—If, under the act, farmers combined and pooled their crops for the purpose of obtaining a greater price than the real value, and it should be judicially determined that such was the case, the contract would be invalid and without binding force upon one who entered into it, even though he did so voluntarily.

13. Same.—Where defendant agreed to permit plaintiff society to hold his tobacco in common with other tobacco, and sell it when placed in pool with tobacco grown by others in the absence of a showing that the object of the contract was to enhance beyond its real value the price of the tobacco pledged to it, the contract will be held valid, under Acts 1906, p. 429, c. 117, legalizing the pooling of farm products for the purpose of obtaining a higher price than could be received by selling individually.

J. G. VALLANDINGHAM and M. H. BOURNE for plaintiff.

JAS. SETTLE for defendants.

OPINION OF THE COURT BY JUDGE CARROLL—Overruling motion to dissolve injunction.

This record comes before me as judge of the Court of Appeals on a motion to dissolve an injunction granted by the judge of the Owen circuit court sitting in chambers, restraining the defendant B. S. Brumback "from shipping, selling, or otherwise disposing of his 1907 crop of tobacco himself or causing it to be shipped, sold, or disposed of by any other for him, until the further order of this court."

Preliminary to the main question in the case, counsel for defendants insist that his motion to require the plaintiffs to execute a bond for costs

should have been sustained; that the notice of the application for the injunction was not sufficient; that the petition is in "ordinary," and should have been an equitable proceeding; and that a general demurrer to it should have been sustained. The Code (Civ. Code Prac. sections 616, 617) provides that corporations, other than a bank created by the laws of the State, shall file in the clerk's office a bond to secure the payment of the costs, and that, if the bond be not given, the action shall be dismissed on motion of the defendant, unless in a reasonable time, to be allowed by the court, after the motion is made, such bond be filed. The question of the execution of this bond did not properly come before the judge in disposing of the motion to issue an injunction. At the next term of the court this matter can be disposed of in the regular way. Nor was the failure to style the petition a "petition in equity" cause for dismissing it. It may, as provided in the Code (Civ. Code Prac. section 10), be transferred to the proper docket during court when it convenes; and as the defendant was present and heard by counsel upon the question of whether an injunction should be granted or not, it is not necessary to inquire into the sufficiency of the notice. Nor did the judge err in declining to pass on the general demurrer filed. In cases of this character, where an application for an injunction is made, the only matters that can properly be considered by the judge or officer is whether or not the statements in the verified petition alone, or considered in connection with the affidavits that may be filed with it, show such a state of case as would authorize the relief that is sought.

The petition charges in substance that the Owen County Burley Tobacco Society is a corporation or-

ganized under the laws of the State of Kentucky, and is a branch of the American Society of Equity; that it is engaged in the business of handling and selling tobacco for many growers, who have placed their tobacco in its possession for these purposes; that the defendant Brumback signed an agreement pledging his 1907 crop of tobacco to the plaintiff, and agreed with it and each and every member of the board of control of the society, and with many and various other growers and owners of tobacco, that the society should hold his tobacco in common with various other tobaccos and sell the same when placed in pool with tobacco grown and owned by various other persons; that he has prized and shipped a part of his crop of 1907, and is now prizing and preparing to ship the whole of the crop; and, if he is permitted to ship and sell the same, it will work irreparable injury to these plaintiffs and all poolers of tobacco. The petition was supported by affidavits, and controverted by the affidavit of the defendant. If the contract entered into between Brumback and the society is a valid and enforceable contract, then the society is entitled to the relief prayed for. The society could not obtain proper or adequate relief in an action at law for damages, or, indeed, in any other way than by restraining the defendant from disposing of the property that he had pledged to it. Having agreed with the society and the other members thereof to surrender the control and disposition of the tobacco to it, it would be a breach of contract on his part to afterwards, without the consent of the society, sell or otherwise dispose of it. The injury to the society could not be measured in dollars and cents. Organized for the mutual protection and advantage of each of its members, receiving no gain and making

no profit from the transaction, it would be wholly impracticable to estimate what damage it would sustain if the members should dispose of their crops. The life and usefulness of the society depends entirely upon the fidelity of the members in observing the agreement, and their failure to comply with it would necessarily work a dissolution of the society, and consequently have the effect of depriving the members of the benefits and advantages they might expect to derive from its existence. What these benefits or advantages may be does not appear in the record before me; nor is it necessary, indeed, that it should. It may be assumed, from the fact that a number of persons have agreed with each other to place in the hands of an agent property owned by them for sale, that each of them expects to derive some benefit or advantage from the arrangement; and, however uncertain or speculative it may be, the agreement is binding on each of the parties to it, and neither of them will be allowed wilfully to violate his pledge. As an illustration of the fact that the remedy at law for an action in damages would be wholly inadequate, let us suppose that the society should bring an action at law against the defendant for damages growing out of his breach of contract and disposing of his tobacco in violation of the agreement entered into. What would be the measure of damage? How could the damage be ascertained? What loss had the society suffered? What injury had been done to its various members? What should the amount of recovery be? It is apparent that to all these inquiries an unsatisfactory answer must be made. There has been a breach of contract, and an injury; but the damages caused by the breach complained of are not in their nature susceptible of proof or estimation.

Of course, the assumption that an injunction will lie is based upon the proposition that the agreement is a valid and enforceable one; and this depends upon the question whether or not the act of March 21, 1906 (found in Sessions Acts of 1906 at page 429), authorizing farmers to pledge and pool their crops, is constitutional. This act, which is entitled "An act permitting persons to combine or pool their crops of wheat, tobacco and other products and sell same as a whole, and making contracts in pursuance thereof valid," provides:

"Section 1. It is hereby declared lawful for any number of persons to combine, unite, or pool, any or all of the crops of wheat, tobacco, corn, oats, hay, or other farm products raised by them, for the purpose of classifying, grading, storing, holding, selling or disposing of same, either in parcels or as a whole, in order or for the purpose of obtaining a greater or higher price therefor than they might or could obtain or receive by selling said crops separately or individually.

"Section 2. That contracts or agreements made or entered into by persons with each other, the object or intent of which is to unite, pool or combine all or any of the crops of tobacco, wheat, corn, oats, hay, or other farm products, raised by such persons, for the purpose of classifying, grading, storing, holding, selling or disposing of said crops, or any of them, either in parts or as a whole, in order, or for the purpose of obtaining a better or higher price therefor than could or might be obtained by selling said crops separately or individually, are hereby permitted, and shall not, because of any such combination or purpose of said persons, be declared illegal or invalid.

"Section 3. Such persons so entering into such

agreement or contract as is set out in the foregoing sections, are hereby permitted to select an agent or agents through or by or with whom said parties so entering into such agreements may classify, grade, store, hold, sell or dispose of said crops, or any of them, and said agent or agents shall have the right to take, receive, hold, store, classify, grade, sell or dispose of said crops so placed in such agreement, as directed or authorized by their principals, for. the purpose of accomplishing the object of such combination or agreement between such principals, and contracts and agreements entered into by such agent or agents for the purpose of classifying, grading, storing, holding, selling or disposing of said crops so combined, united or pooled, either in parcels or as a whole, are hereby permitted, and shall not, because of any such combination, or purpose of such original agreement of such principals so entering into said combination, or of such agent or agents, be declared illegal or invalid."

It will be observed that the purpose of this act is to legalize the pooling of farm products for the purpose of classifying, grading, and selling same, in order that a higher price may be obtained for the products than could be received if they were sold by the individuals owning them, and, furthermore, to authorize the parties forming the pool to select agents to hold the crops pooled for the purpose of classifying, grading, and disposing of them. The validity of this act is assailed upon the ground that it is in violation of section 3 of the Bill of Rights, declaring in part that "no grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men except in consideration of public service," and section 198 of the Constitution, providing that

"it shall be the duty of the General Assembly from time to time as necessity may require to enact such laws as may be necessary to prevent all trusts, pools, combinations or other organizations from combining to depreciate below its real value any article or to enhance the cost of any article above its real value," and in contravention of the fourteenth amendment to the Constitution of the United States.

In answer to the argument that this legislation is prohibited by section 3 of the Bill of Rights, it is sufficient to say that it does not grant any exclusive, separate public emoluments or privileges within the fair meaning of this section. While this section forbids the Legislature from granting exclusive privileges or emoluments, except in consideration of public service, it does not deny it the right to select and classify persons or occupations, or the right to enact reasonable laws for the government of each class that is dealt with. This power of selection and classification has been so frequently exercised that the right to do so cannot be considered an open question. Nor does this right depend for its validity upon the police power of the State, as independent of this power the right to select and classify exists. Hager, Auditor, v. Walker 128 Ky.——, 32 Ky. Law Rep. 748; 107 S. W. 254; Commonwealth v. Remington Typewriter Company, 127 Ky. 177, 105 S. W. 399, 32 Ky. Law Rep. 189. Looking at the act from this viewpoint, and as simply selecting a class of persons to deal with, it must be considered as within the power of the Legislature to enact it. The act does not attempt to regulate or control or prescribe any other occupation or business. What effect, if any, the privilege of combination conferred on farmers, to the end that a greater price might be obtained for the product

raised by them, would have on other classes of per-
sons, if the act in terms excluded other persons from
its operation and effect, or if other persons were
complaining, is not before me.  The act, although
confining the privileges granted by it to farmers,
does not in terms prohibit other persons or corpora-
tions from pooling their products, or from pledging
them to an agent to dispose of.  The act is classifi-
cation, but not exclusion.  It confers privileges upon
a class, but does not withhold from others their en-
joyment.  The validity or reach of the act, as applied
to or affecting others than farmers, I express no
opinion concerning.  No person is objecting because
he is denied the privileges or immunities conferred
upon this class of our citizens.  It is assailed by one
of the class for whose benefit it was enacted, and who
upon the record before me must be treated as having
voluntarily entered into the agreement authorized by
it.  If this act undertook to confer on farmers the
exclusive privilege of combining and pooling their
crops, to the end that a greater price might be ob-
tained therefor, and expressly denied to other classes
or persons the right to combine or pool their products
for the same purpose, or if it should be so construed,
it is plain that it would be in direct violation, not
only of section 3 of the Bill of Rights, but of the
fourteenth amendment to the Constitution of the
United States.  The reading of section 3 of the Bill
of Rights, with its simple, yet strong, language, so
easily understood that no person of ordinary intelli-
gence can mistake its meaning, leaves no room to
doubt that "no grant of exclusive, separate public
emoluments or privileges shall be made to any man
or set of men."  Nor is it open to controversy that
if the right was conferred upon certain specified per-

sons or a class to combine or pool their crops or products in order that a better price might be obtained for them, and all other persons and classes were excluded from and denied this privilege, that it would be granting to the favored class "exclusive separate privileges." This point was expressly decided in Simpson v. K. B. & L. Ass'n, 101 Ky. 496, 41 S. W. 570, and Gordon v. Winchester B. & L. Ass'n, 12 Bush, 110, 23 Am. Rep. 713, and the correctness of the ruling is so manifest that it does not need further elaboration.

Treating the act solely as a selection of a class of persons upon whom specified privileges are conferred, it is not in contravention of the fourteenth amendment, to the Constitution of the United States, providing that: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall a state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law." This section has been frequently considered by the Supreme Court of the United States, and it has been ruled that it does not deny the State the right to classify and select occupations, trades, and professions. As stated in Magoun v. Illinois Trust & Savings Bank, 170 U. S. 283, 18 Sup. Ct. 594, 42 L. Ed. 1037: "In other words, a state may distinguish, select, and classify objects of legislation, and necessarily this power must have a wide range of discretion. It is not without limitation, of course." And in Bell's Gap R. R. Co. v. Pennsylvania, 134 U. S. 232, 10 Sup. Ct. 533, 38 L. Ed. 892, the court said: "Clear and hostile discrimination against particular persons and classes, especially such as are of an unusual char-

acter, unknown to the practice of our governments, might be obnoxious to the constitutional prohibition." To the same effect, (Gulf, Colorado, & Santa Fe R. Co. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666. Nor does this amendment prohibit the State from granting rights or conferring privileges on persons or classes, but only declares that, when rights or privileges are conferred, all persons and classes that may be fairly included within the scope of the law granting the privileges or immunities shall have the benefit of them, whether so intended or not. Hayes v. State of Missouri, 120 U. S. 68, 7 Sup. Ct. 350, 30 L. Ed. 578; Barbier v. Connolly, 113 U. S. 27, 5 Sup Ct. 357, 28 L. Ed. 923; Connolly v. Union Sewer Pipe Co., 184 U. S., 546, 22 Sup. Ct. 431, 46 L. Ed. 679; Commonwealth v. Johnson, 78 Ky. 509. This act does not in terms discriminate against any other person or class of persons; and if it could be held to be discriminatory it is clear that that question cannot be raised by the defendant. He has not been discriminated against. He has not been denied any privilege or immunity that is granted to any other person or class of persons, nor has he been denied the equal protection of the law.

It is next insisted that it is in violation of section 198 of the Constitution, before quoted. In considering this aspect of the case, I shall assume that the purpose of the act is as stated in it—to permit the pooling and combining of crops for the purpose of classifying, grading, and disposing of the same, in order that a greater or higher price may be obtained therefor than could be received by selling the crops separately. It is manifest that the real, and in fact only, object of the act was to enable the producers by pooling and combination to obtain better prices

than they could get if they sold their crops sepe-
rately and as distinct individuals. The right to se-
lect, grade, store, and hold is merely a means to
the accomplishment of the chief end, which is to get
a greater price. It would be idle to say that the
Legislature intended only that the producers might
combine for the purpose of grading, classifying, and
storing their crops, and this was the sole purpose of
the act; and it was not contemplated or intended that
by this process of grading, classification, and storing
they should regulate or control the market, and
thereby obtain a higher price for the crops than they
could command as individuals. It would be equally
absurd to say to the farmer that this act only allowed
him to grade and classify, but not to fix, regulate,
and control the price of, the product, when he knows,
as must every one else who reads the act know, that
the end to be accomplished was to control, regulate,
and fix the price by placing all the crops in the hands
of a central agent, with power to hold them until a
reasonable and adequate price could be obtained.
This is the only construction the act is susceptible
of, in my judgment.

To put the question plainly: "Is the act invalid,
under section 198, because it allows a class of per-
sons to make contracts or agreements with each other,
the intent of which is to pool and combine their to-
bacco, or wheat, or corn, or hay, or other farm
products raised by them, and to select an agent to
hold the crop or crops so combined or pooled, "in
order or for the purpose of obtaining a greater or
higher price therefor than they might or could obtain
or receive by selling said crop separately or indi-
vidually." The Constitution does not prohibit trusts,
pools, or combinations; nor does it command the

General Assembly to enact laws forbidding trusts, pools, or combinations. The lawmaking department is left to determine for itself the necessity that exists for legislation upon this question. It may or may not, in its discretion, act. The section is not self-executing. It only declares that it shall be the duty of the General Assembly from time to time, as necessity may require, to enact such laws as may be necessary to prevent all trusts, pools, combinations, or other organizations from combining to depreciate below its real value any article, or to enhance the cost of any article, above its real value. A trust, pool, or combination, unless created or formed for the purpose of depreciating below its real value any article, or enhancing the cost of any article, above its real value, or unless the reasonable effect of the trust, pool, or combination would be to depreciate below its real value an article or to enhance the cost of an article above its real value, is not forbidden. To put it in another way, it would seem that, so far as this section is concerned, trusts, pools, and combinations, the only purpose of which is to obtain a fair and reasonable price for an article are permitted. The Legislature could not enact a law legalizing a pool or combination of persons for the purpose of enhancing the cost of any article above its real value or depreciating it below its real value, yet, it may legalize such pool or combination as is created or organized for the purpose of obtaining fair and remunerative prices.

In some respects this is a curiously worded section. It seems to recognize that combinations and pools may be useful, as well as lawful, if the only purpose of forming them is to secure a fair and reasonable price for the articles owned by the persons who

organize the association. As an abstract question, no sound objection can be found to the proposition that it is not unlawful to seek to obtain for property its fair and reasonable value, and it may be conceded that associations having in view only these purposes are not objectionable, although it is not difficult to understand that the apparently fair and harmless declaration contained in the Constitution might result in procuring a very different condition of affairs from that intended by the Constitution makers, if manufacturers, dealers, and traders, generally were allowed to combine and pool their interests and products for the ostensible purpose of getting a fair and reasonable price therefor. The act of 1906 does not authorize or permit a pool or combination to enhance the cost of crops above their real value. This is not the proper construction, and if it allowed owners to place the price of crops above their real value it would clearly be a violation of the Constitution.

In giving to the act this construction, the prevailing conditions that gave rise to its enactment may with much propriety be considered. The farmers, scattered all over the State, each acting independently and separately for himself, were unable to dispose of their crops at a fair and reasonable price. There was practically no competition among the purchasers of the crops. A combination and trust had been formed by the buyers to depreciate the value of the crops below their real value, and single-handed the producers were unable to combat or deal in terms of equality with these trusts and combinations that controlled the markets in which the farmers was obliged to dispose of his produce. To meet the condition of affairs thus presented, and to enable

the farmers to combine their resources and place their products in the hands of an agent selected by them, to the end that better prices might be obtained, this act was passed. If under this act the farmers, associated with defendant, were combining and pooling their crops for the purpose of obtaining for them a greater price than the real value, and it should be judicially determined that this was true, the contract entered into in my judgment would be without binding force or effect upon the defendant, although he voluntarily consented to become a member of the society or organization. It could not for a moment be entertained that a contract entered into for the purpose of enhancing the price of an article above its real value would be binding upon the parties to it. Such a contract would not be authorized by the act of 1906, nor would the Legislature have the power to pass an act that would enable or permit persons or classes of persons to do things that are contrary to public policy and that have always met with the severest condemnation of the courts. As section 198 of the Constitution does not prescribe the character of legislation that shall be enacted on the subject of pools, trusts, and combinations, the Legislature, not being limited by the Constitution, may provide such laws as will prohibit them. Indeed, the act of 1890 (1 Acts 1889-90, p. 143, c. 1621), which is a sweeping condemnation of all pools, trusts, and combinations created or organized for the purpose of "regulating, or controlling, or fixing the price of any merchandise, manufactured article, or property of any kind, * * * or having for its object the fixing or in any way limiting the amount or quality of any article or property, commodity or merchandise to be produced or manufactured, mined, bought or sold," was held

to be in force and applicable to all classes of persons within its reach after the adoption of the present Constitution and before the passage of the act of 1906. Commonwealth v. Grinstead, 108 Ky. 59, 21 Ky. Law Rep. 1444, 55 S. W. 720, 57 S. W. 471; Commonwealth v. Bavarian Brewing Company, 112 Ky. 928, 66 S. W. 1016, 23 Ky. Law Rep. 24; International Harvester Company v. Commonwealth, 99 S. W. 637, 30 Ky. Law Rep. 716. 124 Ky. 543.

I entertain no doubt that the act of 1906, considered alone, and with reference to the questions raised by the defendant, is a valid exercise of legislative power: It does not violate the Constitution either of this State or of the United States; and, as the record does not show that the plaintiff society is attempting to enhance the price of the tobacco pledged to it beyond its real value, the motion to dissolve the injunction must be overruled.

All of the judges, with the exception of Chief Justice O'REAR, who is absent, considered with me this application, and all of them concur in the conclusion reached. Judges SETTLE and NUNN do not agree to all the reasoning of the opinion. ,