IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

MIDDLE DIVISION.

NASHVILLE, DECEMBER TERM, 1924.

DARK TOBACCO GROWERS' CO-OP. ASS'N *et al. v.* C. C.
DUNN *et al.*

(*Nashville.* December Term, 1924.)

1. **MONOPOLIES.** Kentucky act authorizing formation of co-operative
   marketing associations held not violative of State or federal anti-
   trust statutes.

   Bingham Co-Operative Marketing Act, Ky., authorizing formation
   of co-operative marketing associations for distribution of agricul-
   tural products, *held* not violative of either State or federal Anti-
   Trust Statutes (U. S. Comp. St. section 8820 et seq.). (*Post, p.*
   617.)

   Acts cited and construed: Acts 1903, ch. 140.

   Cases cited and approved: Potter v. Dark Tobacco Growers' Co-opera-
   tive Ass'n, 201 Ky., 441; Dark Tobacco Growers' Co-operative
   Ass'n v. Mason, 263 S. W., 60.

2. **AGRICULTURE.** Constitutional law. Kentucky act authorizing
   formation of co-operative marketing associations held constitutional.

---

*On validity of organization of co-operative marketing of farm prod-
ucts by producers' association, see note in 25 A. L. R., 1113.

614

Dark Tobacco Growers' Co-Op. Ass'n v. Dunn.

Bingham Co-Operative Marketing Act, Ky., which authorizes forma-
tion of co-operative marketing associations to distribute agricul-
tural products, *held* not violative of equal protection clause of
Const. U. S. Amend. 14, in view of its object as disclosed in sec-
tions 1, 28; and so long as an association organized thereunder
commits no act detrimental to public welfare it is a lawful organi-
zation and its contracts with producers are not subject to attack.
(*Post, pp.* 617, 618.)

Cases cited and approved: Connolly v. Union Sewer Pipe Co., 184
U. S., 540; Northern Wisconsin Pool v. Bekkedal, 197 N. W., 936;
Brown v. Staple Cotton Ass'n, 132 Miss., 859; Texas Farm Bureau
Ass'n v. Stovall, 253 S. W., 1101; Kansas Wheat Growers Co-op.
Ass'n v. Schulte, 113 Kans., 672; Oregon Growers v. Lentz, 107
Or., 561; Washington Cranberry Growers' Ass'n v. Moore, 117
Wash., 430; Citrus Fruit Ass'n. v. Yeoman, 51 Cal. App., 759; Ex
parte Baldwin Co. Producers' Corporation, 203 Ala., 345; Castor-
land Milk Co. v. Shantz, 179 N. Y. S., 131; Mar-Hof Co. v. Rosen-
backer, 176 N. C., 330; Bradshaw v. Millikin, 173 N. C., 432; Stand-
ard Oil Co. v. U. S., 221 U. S., 1; U. S. v. Am. Tobacco Co., 221
U. S., 106; City of Louisville v. Coulter, 177 Ky., 242; Owen Co.
Society v. Brumback, 128 Ky., 137; Douglas Park Jockey Club v.
Talbott, 173 Ky., 685; Commonwealth v. Remington Typewriter
Co., 127 Ky., 177; Barbier v. Connolly, 113 U. S., 27; South Caro-
lina ex rel. Phoenix Ins. Co. v. McMaster, 237 U. S., 63; Am. Sugar
Refining Co. v. Louisiana 179 U. S., 89; German Alliance Ins. Co.
v. Lewis, 233 U. S., 389; N. Y. Cen. R. Co. v. White, 243 U. S., 188;
Ward v. Krinsky, 259 U. S., 503; Smith v. K. C. Trust Co., 255 U.
S., 180; Nat. Union Fire Ins. Co. v. Wanberg, 260 U. S., 71; Duplex
Printing Co. v. Dearing, 254 U. S., 443; Connolly v Union Sewer
Pipe Co., 184 U. S., 541.

Cases cited and distinguished: Burley Tobacco Growers' Co-operative
Ass'n v. Gardner, Ohio State, —; Dark Tobacco Growers' Ass'n v.
Potter, 201 Ky., 441; Tobacco Growers' Co-op. Ass'n. v. Jones, 185
N. C., 265; Burley Tobacco Co. v. Gillaspy, 51 Ind. App., 583.

3. **MONOPOLIES.** Anti-Trust Statute is directed against monopoly
and not against expectation of it.

Federal Anti-Trust Statute (U. S. Comp. St. section 8820 et seq.) is directed against monopoly, and not expectation of it. (*Post, pp.* 618-628.)

4. **INJUNCTION.** Co-operative association held entitled to injunction against mortgagee of tobacco.

Where grower contracted to sell tobacco to co-operative marketing association, organized pursuant to Bingham Co-Operative Marketing Act, Ky., and bank with knowledge of such contract took a mortgage on such tobacco, association *held* entitled to injunction restraining bank from interfering with contract in view of section 18 of Kentucky Act and of Acts 1923, chapter 100, section 19, notwithstanding provision in contract for liquidated damages. (*Post, pp.* 629-632.)

Cases cited and approved: Burley Tobacco Growers' Co-op. Ass'n v. Smith, — Ky., —; Owen County Society v. Brumback, 128 Ky., 137; Kansas Wheat Growers' Ass'n v. Ben Robben and Farmers' State Bank of Mount Hope, 116 Kan., 522; Phez v. Salem Fruit Union, 103 Or., 514; Washington Co-op. Egg & Poultry Ass'n v. Taylor, 122 Wash., 466; Grant County Board v. Allphin, 152 Ky., 280.

Case cited and distinguished: Shields v. Land Co., 94 Tenn., 147.

*Headnotes 1. Monopolies, 27 Cyc, p. 899; 2. Constitutional Law, 12 C. J., section 895 (1926 Anno); Agriculture, 2 C. J., section 26a (1926 Anno); 3. Monopolies, 27 Cyc, p. 899; 4. Injunctions, 32 C. J., section 335.

FROM MONTGOMERY.

Appeal from the Chancery Court of Montgomery County.—Hon. J. W. STOUT, Judge.

H. N. LEECH and H. B. STOUT, for appellants.

ABE D. WALDAUER, AARON SAPIRO, R. W. BINGHAM and A. R. GHOLSON, for appellees.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

This suit involves, primarily, the validity of the Bingham Co-operative Marketing Act, chapter 1, Acts of Kentucky 1922.

In *Potter* v. *Dark Tobacco Growers' Co-operative Association,* 201 Ky., 441, 257 S. W., 33, the court of appeals of Kentucky held said act valid. While such decision is persuasive, this court will not follow same if it violates some statute of this State, or if in contravention of some provision of the Constitution of the United States.

This court, in *Dark Tobacco Growers' Co-operative Association* v. *Mason,* 263 S. W., 60, held the act to be valid, and stated that it was not violative of our Anti-Trust Statute, chapter 140, Acts of 1903, or of the federal Anti-Trust Statute (U. S. Comp. St., section 8820 et seq.). The provisions of the Bingham Act were set out in the opinion in the Mason Case and will not be repeated here.

It is said that the record in that case did not properly present the constitutional questions for the reason that they were not relied upon in the motion for a new trial.

Without entering into a discussion of that matter, it is only necessary to state that the constitutional questions dealt with in the opinion were carefully considered, and we are still of the opinion that they were correctly answered.

It is further insisted that the Bingham Act violates the equal protection clause of the Fourteenth Amendment to the federal Constitution (a defense not interposed in the Mason Case), and counsel cite and rely upon *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S., 540, 22 S. Ct., 431, 46 L. Ed., 679, in which the supreme court held that the Illinois Anti-Trust Statute violated said provision of the Constitution because it excepted from the provisions of the act "agricultural products or live stock while in the hands of the producer or raiser."

In that case the court was dealing with a statute which made trusts or combinations in restraint of trade a crime, but which excepted from its provisions "producers of agriculture and raisers of live stock." Certainly no reasonable justification could be offered in support of a classification of that nature. If it is wrong for a merchant to monopolize a particular business, it is likewise wrong for a farmer to do so. The principle is the same in both cases. If the act here involved has for its object the destruction of competition and the creation of a monopoly, then it violates the equal protection clause of the Constitution and is invalid.

In the Mason Case this court held, in effect, that the Bingham Act did not authorize a trust or combination, but rather negatived any such idea by the twenty-eighth section, as follows:

"Any association organized hereunder shall be deemed not to be a conspiracy nor a combination in restrain of trade nor an illegal monopoly; nor an attempt to lessen competition or to fix prices arbitrarily or to create a combination or pool in violation of any law of this State; and the marketing contracts and agreements between

the association and its members and any agreements authorized in this act shall be considered not to be illegal nor in restraint of trade nor contrary to the provisions of any statute enacted against pooling or conbinations.''

The purpose of the act is set forth in section 1, as follows:

''In order to promote, foster and encourage the intelligent and orderly marketing of agricultural products through co-operation, and to eliminate speculation and waste; and to make the distribution of agricultural products between producer and consumer as direct as can be efficiently done; and to stabilize the marketing of agricultural products, this act is passed.''.

Giving the act full faith and credit, and taking into consideration the history of co-operative associations, it appears that the purpose is to reduce rather than increase the price paid by the consumer, and thereby create a demand for larger quantities of farm products. The object sought is an increased return to the producer by eliminating speculation and waste, obviating dumping, reducing freight rates, marketing in an orderly and economic manner, making the distribution of agricultural products between producer and consumer as direct as can be efficiently done, studying marketing problems from the standpoint of the consumer, and creating new markets.

Statistics show that the price paid by the consumer for farm products is sufficiently high, but that the producer receives only thirty-five per cent. of this sum, the middleman (so to speak) receiving sixty-five per cent. One of the main objects of the association is to bring about a more just apportionment of the price paid by

the consumer. The righteousness of this claim on the part of the producer is generally conceded.

Economists agree that the farmer can only obtain a fair price for his produce by group marketing or co-operation. By co-operation the *per capita* consumption of California oranges in America was doubled in sixteen years. This was accomplished by proper grading, packing, orderly marketing, and by extensive advertising. The California Fruit Growers' Exchange spent for advertising last year $875,000. But for co-operation increased consumption by means of advertising would have been impossible. By co-operation $3,000,000 a year in freight was saved, and the total cost of selling and advertising for 1923 amounted to but two and forty-nine hundredths per cent. of the value of delivered fruit.

The foregoing facts appear in an article in the Country Gentleman of October 11, 1924, entitled "The Future of Co-operation."

No successful effort has been made to dissolve the California Fruit Growers' Association upon the ground that it is a trust. From the article referred to above it appears that there are 10,000 co-operatives in operation in this country that did a business of $2,200,000,000 in 1923.

We are impressed with the idea that co-operative marketing of farm products is an economic necessity. It was championed by all three parties in the recent national political contest. It has been enacted into law by the Congress of the United States (The Capper-Volstead Act [U. S. Comp. St. Ann. Supp., 1923, sections 8716½, 8716½a]), and by the legislatures in two-thirds of the States. The legislature of Tennessee passed such an

act in 1923 (chapter 100). ·The policy of the State, as expressed by the legislature, is found in section 5 of said act, as follows:

"That every group of persons contemplating the organization of an association under this act is urged to communicate with the College of Agriculture, University of Tennessee, who will inform them whatever survey of the marketing conditions affecting the commodities proposed to be handled may indicate regarding probable success. ·

"It is here recognized that agriculture is characterized by individual production in contrast to the group or factory system that characterizes other forms of industrial production; and that the ordinary form of corporate organization permits industrial groups to combine for the purpose of group production and the ensuing group marketing and that the public has an interest in permitting farmers to bring their industry to the high degree of efficiency and merchandising skill evidenced in the manufacturing industries; and that the public interest urgently needs to prevent the migration from the farm to the city in order to keep up farm production and to preserve the agricultural supply of the nation; and that the public interest demands that the farmer be encouraged to attain a superior and more direct system of marketing in the substitution of merchandising for the blind, unscientific and speculative selling of crops; and that for this purpose, the farmers should secure special guidance and instructive data from the College of Agriculture, University of Tennessee."

The validity of these acts have been sustained by every court passing upon them. *Burley Tobacco Growers' Co.-*

*operative Association* v. *Gardner,* Ohio State (N. P.), decided February 24, 1924, in a written opinion; *Northern Wisconsin Pool* v. *Bekkedal* (Wis. 1924), 197 N. W., 936; *Dark Tobacco Growers' Association* v. *Potter* (1923), 201 Ky., 441, 257 S. W., 35; *Tobacco Growers' Co-operative Association* v. *Jones* (1923), 185 N. C., 265 117 S. E., 174; *Brown* v. *Staple Cotton Association* (1923), 132 Miss., 859, 96 So., 849; *Texas Farm Bureau Association* v. *Stovall* (Tex. Sup., 1923), 253 S. W., 1101; *Kansas Wheat Growers' Co-operative Association* v. *Schulte* (1923), 113 Kan., 672, 216 P., 311; *Oregon Growers* v. *Lentz* (1923), 107 Or., 561, 212 P., 811; *Washington Cranberry Growers' Association* v. *Moore* (1922), 117 Wash., 430, 201 P., 773, 204 P., 811, 25 A. L. R., 1077; *Citrus Fruit Association* v. *Yeoman* (1921), 51 Cal. App., 759, 197 P., 959; *Ex parte Baldwin County Producers' Corporation* (1919), 203 Ala., 345, 83 So., 69 *Castorland Milk Co.* v. *Shantz* (Sup., 1919), 179 N. Y. S., 131.

In the foregoing cases the co-operative acts are discussed in their various phases, and we will only quote from two or three of them with respect to the application of the equal protection clause of the Constitution.

In *Burley Tobacco Growers' Co-operative Association* v. *Gardner, supra,* the court said:

"Reliance is principally had upon the case of *Connolly* v. *Union Sewer Pipe Co.* Were it not for the later decisions of the supreme court of the United States, which either expressly overrule or distinguish the Connolly Case, where agricultural interests are involved, the court would be constrained to hold that the effect of this decision would be to nullify the co-operative acts in Ohio, or render the contracts made thereunder illegal and void.

However, there has been a constantly increasing tendency of the supreme court of the United States to depart from the apparent reasoning in the Connolly Case, and to distinguish it wherever possible; and to hold that the rule should be limited and not extended, if it has not, in fact, in later decisions, overruled this case.''

In *Tobacco Growers' Co-operative Association* v. *Jones,* supra, the court said:

''In view of the necessity of protecting those engaged in raising tobacco against the combination of those who buy the raw product at their own figures and sell it to the public at prices also fixed by themselves, this move-ment has been organized. By a careful examination of all the provisions of the act under which the association is acting, it will be seen that every precaution has been taken to insure that it will not be used for private gain and can operate only for the protection of the producers.

''In *Mar-Hof Co.* v. *Rosenbacker,* 176 N. C., 330, 97 S. E., 169, the whole subject is admirably discussed by Mr. Justice HOKE, in which he states that originally at common law all agreements in restraint of trade were held void as being against public policy. This, however, he says has been more and more modified by the decisions of the courts, until it has come to be a generally accepted principle that agreements in partial restraint of trade would be upheld, when they are 'founded on valuable considerations,' are reasonable and necessary to protect the interest of the parties in whose favor they are imposed, and do not unduly prejudice the public interest—quoting Clark on Contracts. This same doctrine has been sustained in *Bradshaw* v. *Millikin,* 173 N. C., 432, 92 S. E., 161, L. R. A., 1917E, 880. In two

notable instances, *Standard Oil Co.* v. *U. S.*, 221 U. S., 1, 31 S. Ct., 502, 55 L. Ed., 619, 34 L. R. A. (N. S.), 834, Ann. Cas., 1912D, 734, and *U. S.* v. *American Tobacco Co.*, 221 U. S., 106, 31 S. Ct., 632, 55 L. Ed., 663, stipulations in partial restraint of trade were held not to be obnoxious to the law, unless they were unreasonable and likely to become monopolies which are obnoxious to our constitutional provisions. Const. N. C., art. 1, section 31, which provides that 'monopolies are contrary to the genius of a free State, and ought not to be allowed.'

"An examination of this statute shows, we think, that this association is authorized for the purpose, not of creating a monopoly, but to protect the tobacco producers against oppression by a combination of those who buy, and not to authorize, and does not empower, those who produce the raw materials to create a monopoly in themselves."

In *Potter* v. *Dark Tobacco Growers' Co-operative Association*, supra, the court said:

"Nor are the Clayton Act and the many other recent acts of Congress treating farmers as a distinct class the only expressions of such a change in public opinion and the public policy of our nation with reference to them and their economic problems. The enactment by the legislatures of thirty or more of the States of enabling acts precisely like the Bingham Co-operative Marketing Act is further evidence of the present state of public opinion on the matter, as is the attitude of every other agency through which an enlightened public policy may be dedeclared, including the most recent resumé of the State of the Union by the President of the United States.

"The basis of this change in public opinion toward combination and classification is not in any sense political, but economic rather, and, in our jüdgment, it is because of basic economic conditions, affecting vitally not only the farmers, but also the public weal, that the classification based upon agricultural pursuits is reasonable, just, and imperative for the good of the entire nation and every citizen thereof. If this be true, the Bingham Act is based upon a classification that is not offensive to the equal protection provisions of the Fourteenth Amendment. *City of Louisville* v. *Coulter,* 177 Ky., 242, 197 S. W., 819, L. R. A., 1918A, 811; *Owen County Society* v. *Brumback,* 128 Ky., 137, 107 S. W., 710; *Douglas Park Jockey Club* v. *Talbott,* 173 Ky., 685, 191 S. W., 474; *Commonwealth* v. *Remington Typewriter Co.,* 127 Ky., 177, 105 S. W., 399; *Barbier* v. *Connolly,* 113 U. S., 27, 5 S. Ct., 357, 28 L. Ed., 923; *South Carolina ex rel. Phœnix Ins. Co.* v. *McMaster,* 237 U. S., 63, 35 S. Ct., 504, 59 L. Ed., 839; *American Sugar Refining Co.* v. *Louisiana,* 179 U. S., 89, 21 S. Ct., 43, 45 L. Ed., 102; *German Alliance Ins. Co.* v. *Lewis,* 233 U. S., 389, 34 S. Ct., 612, 58 L. Ed., 1011, L. R. A., 1915C, 1189; *N. Y. Central R. Co.* v. *White,* 243 U. S., 188, 37 S. Ct., 247, 61 L. Ed., 667, L. R. A., 1917D, 1 Ann. Cas., 1917D, 629; *Ward* v. *Krinsky,* 259 U. S., 503, 42 S. Ct., 529, 66 L. Ed., 1033; *Smith* v. *Kansas City Trust Co.,* 255 U. S., 180, 41 S. Ct., 243, 65 L. Ed., 577; *National Union Fire Ins. Co.* v. *Wanberg,* 260 U. S., 71, 43 S. Ct., 32, 67 L. Ed., 136; *Duplex Printing Co.* v. *Dearing,* 254 U. S., 443, 41 S. Ct., 172, 65 L. Ed., 349, 16 A. L. R., 196; *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S., 541, 22 S. Ct., 431, 46 L. Ed., 679.

"The fact that other productive groups can, do, and for many years have marketed their wares as groups, and not as individuals, and that they are and have been enabled through group organization or 'gentlemen agreements' to regulate the distribution and stabilize the prices of their products, is a fact known of all men, which can neither be denied nor blinked by the courts; as is also the fact that farmers, if unorganized, necessarily act as individuals and not as groups in marketing their products, resulting in 'dumping' by the farmers, distribution by speculators, an unconscionable and uneconomic spread between producer and consumer in the necessities of life, and an inevitable demoralization of basic economic conditions, to the hurt directly or indirectly of every citizen.

"With a clear recognition of this fact borne in upon the public conscience by the threatened economic collapse of the farming industry indispensable to public welfare and national stability, if not national existence, an enlightened public opinion unmistakenly demands that farmers be permitted to organize for the marketing of their crops, not merely for their own protection, but for the public good.  But what has current public opinion with reference to economic questions to do with constitutional inhibitions and guaranties?  Just this: It often, as here, affords the proper and usual approach for a consideration of their terms and meaning.

"That all law, even constitutional law, is not static, but progressive, and in step always with sound economic conditions and an enlightened public policy, recently has come to be realized clearly, if ever it may have been thought otherwise, as is attested by highest judicial and lay utterances.

"The best evidence of the sure foundation of the federal Constitution is not that it was declaratory of the highest conceptions of truth and justice with reference to community life when it was written, but that, correctly interpreted, it is equally so to-day, despite the many changes time and experience have brought in such conceptions. The Constitution in the Fourteenth Amendment declared the public policy of equal protection of the laws, unalterably, both then and now, it is true, except by formal amendment, but being written for time rather than a day, most wisely left it to the legislatures and the courts to provide the means and define the terms in accordance with an enlightened public consciousness which continually strives toward, and constantly attains, if but slowly and haltingly, a better understanding of community life. Unquestionably, as that complex problem is understood by the best thought of to-day, the Bingham Act, by enabling the farmers to market their crops co-operatively for the purpose, as declared in the act, of regulating distribution and stabilizing the prices of farm products, serves a pressing public need that justifies the classification of farmers as a distinct class, and treats all of the class equally and fairly, and not better, if that were important, than other distinct productive classes are treated under the laws of the State and Nation. It does not, therefore, offend the equal protection provisions of the federal Constitution, notwithstanding the fact that twenty-one years ago the supreme court of the United States, in the case of *Connolly* v. *Union Sewer Pipe Co.*, supra, indicated a somewhat contrary view, but which is, under the more recent decisions of that court, easily distinguished upon several grounds.

"We therefore hold that the act is valid, and that appellant's contract with appellee does not by itself, nor when considered in connection with other like contracts, violate the Sherman Anti-Trust Act as amended.''

In our opinion, the classification of farmers into co-operative associations for the purposes set forth in the act is reasonable and natural, and one that should prove beneficial rather than detrimental to the public.

Until it is established that complainant has committed an act detrimental to the public welfare, it is a lawful organization and its contracts are not subject to attack. In *Tobacco Growers' Co-operative Association* v. *Jones,* supra, the court quoted approvingly from *Burley Tobacco Co.* v. *Gillaspy,* 51 Ind. App., 583, 100 N. E., 93, as follows:

"In the above case, the court held that a statute authorizing the pooling of crops for the purpose of depreciating any commodity below, or enhancing it above, its true value would be in violation of the constitutional provision, and any pool or combination entered into for such purpose would be invalid; but, in the absence of some allegation or proof that such was the purpose of the combination, courts would indulge the presumption that the parties, by entering the combination and by the execution of such contracts, intended only to enter into such engagements as were lawful, and that such contracts should, in the absence of allegations and proof to the contrary, be construed as limited to lawful purposes under the statute and Constitution.''

In our opinion, *Connolly* v. *Union Sewer Pipe Co.,* supra, is not in point, nor in conflict with the conclusions which we have reached. On the other hand, our decision

finds support in later utterances of the supreme court of the United States in the cases enumerated in the Mason Case, in which the court holds that in suits to dissolve because violative of the Anti-Trust Statute it is not a question of whether the corporation has the power to do so, but what it has done and is doing, for that act is directed against monopoly, and not against an expectation of it.

We have carefully considered the various assignments of error interposed by the defendants, and find them without merit, and they are' overruled.

The complainant assigns for error the action of the chancellor in dissolving the injunction.

Defendant Dunn had contracted his tobacco to the complainant. The bill charged that the defendant bank, with actual knowledge of said contract, took a mortgage on said tobacco, and that the transaction was fraudulent. The bill prayed for a specific performance of the contract, and that the bank be enjoined from selling the tobacco under its mortgage, or from interfering with the performance of said contract. A temporary injunction was issued, but, upon motion, was dissolved. This was error.

Section 18 of the Bingham Act and section 19 of our own act provide that upon the filing of a verified bill, showing a breach or threatened breach, the association shall be entitled to an injunction and a decree of specific performance. The contract here sued on contains the following provision:

"The grower agrees that in the event of a breach or a threatened breach by him of the provisions regarding delivery of tobacco, the association shall be entitled

to an injunction to prevent a breach or further breach thereof, and to a decree for specific performance thereof, and the parties agree that this is a contract for the purchase and sale of personal property under special circumstances and conditions, and that the buyer cannot go into the open markets and buy tobacco to replace any which the grower may fail to deliver.''

Such provisions seem to be uniformly upheld by the courts. *Burley Tobacco Growers' Co-operative Association* v. *Smith,* court of appeals of Kentucky, written opinion filed February 16, 1924; *Owen County Society* v. *Brumback,* 128 Ky., 137, 107 S. W., 710; *Kansas Wheat Growers' Association* v. *Ben Robben and Farmers' State Bank of Mount Hope,* 116 Kan., 522, 227 P., 336, July 5, 1924; *Kansas Wheat Growers' Association* v. *Schulte,* supra; *Phez* v. *Salem Fruit Union,* 103 Or., 514, 201 P., 222, 205 P., 970, 25 A. L. R., 1090; *Washington Cranberry Association* v. *Moore,* supra; *Washington Co-operative Egg & Poultry Association* v. *Taylor,* 122 Wash., 466, 210 P., 806; *Tobacco Growers' Co-operative Association* v. *Jones,* supra; *Texas Farm Bureau Cotton Association* v. *Stovall,* supra; *Brown* v. *Staple Cotton Association,* supra; *Northern Wisconsin Pool* v. *Bekkedal,* supra.

The basis of the decisions is obvious. The complainant could not do business without tobacco. When it contracts to sell, it must fill its contracts with tobacco delivered by its members. It cannot replace defendant's tobacco by purchasing upon the open market. Its charter prohibits it from so doing. For each pound of tobacco which is not delivered to the association by a member, there is a *pro rata* increase in the operating costs of the association; and that increase cannot be esti-

mated in terms of money with definite exactness. For every defection of one member, there is a certain amount of dissatisfaction engendered among other members; indeed, other members are encouraged not to deliver their tobacco, and the normal increase of the association's members is prevented. All these things result in damage, but the amount of damage cannot possibly be computed.

In *Brown* v. *Staple Cotton Association,* supra, the court said:

"Without going into the question of how the law stood on this subject in its application to the case at bar prior to the adoption of the co-operative marketing act, chapter 179, Laws of 1922, we find that  .  .  .  the exact remedy here adopted by appellee is provided for. In section 17(b) and section 24 of said act, [almost identical with the Kentucky and Tennessee statutes].  .  .  . it is expressly provided that any co-operative marketing association  .  .  .  shall be entitled to the remedies of liquidated damages, injunction, and specific performance. It is true that said co-operative marketing act, having been adopted after the contract here considered was entered into, does not and could not undertake to control the substantive rights of the parties to the cause. It is not true, however, that the remedies therein provided are not applicable to past as well as future transactions. It is too well settled to merit discussion that a remedy afforded by a statute passed subsequent to the date of the contract in question may be invoked by a party to the contract who has been wronged by its nonperformance."

This rule has been approved by this court in *Shields* v. *Land Co.,* 94 Tenn., 147, 28 S. W., 674, 26 L. R. A., 509, 45 Am. St. Rep., 700, where it was said: "The con-stitutional provision upon which this contention is made is as follows: 'That no retrospective law or law impairing the obligation of contracts, shall be made.' Const. Tenn., article 1, section 20.

"This does not mean that absolutely no retrospective law shall be made, but only that no retrospective law which impairs the obligation of contracts, or divests or impairs vested rights, shall be made. . . .

"It does not inhibit retrospective laws made in furtherance of the police power of the State; and, generally, it does not prohibit remedial legislation."

The provision for liquidated damages does not preclude the right to injunction. *Washington Cranberry Association* v. *Moore,* supra; *Grant County Board* v. *Allphin,* 152 Ky., 280, 153 S. W., 417; *Tobacco Growers' Co-operative Association* v. *Jones,* supra.

It results that the decree of the chancellor will be reversed as to dissolving the injunction, otherwise affirmed.

Defendants will be taxed with all costs and the cause remanded for further proceedings.

Cook, J., does not concur in this opinion except as to result.