## HUGHES TOOL CO. v. MOTION PICTURE ASS'N OF AMERICA, Inc.

District Court, S. D. New York.
June 14, 1946.

---

Poletti, Diamond, Rabin, Freidin & Mackay, of New York City (Charles Poletti, Robert E. Herman, and Richard M. Goldwater, all of New York City, of counsel), for plaintiff.

Rosenman, Goldmark, Colin & Kaye, of New York City (Samuel I. Rosenman and Max Freund, both of New York City, Richard S. Salant, of Washington, D. C., and Milton Shalleck, of New York City, of counsel), for defendant.

BRIGHT, District Judge.

By this motion, plaintiff seeks an injunction pendente lite, restraining defendant from revoking, or taking any steps looking to, the revocation of the seal of approval granted by defendant on May 23, 1941, to plaintiff's motion picture "The Outlaw," and from combining or conspiring with or among its members to prevent or impair plaintiff's distribution and exhibition of such picture.

Upon notice to defendant, a preliminary stay until the determination of this motion was granted by Judge Leibell, restraining

defendant and its officers and agent from (1) revoking or taking any steps looking to the revocation of that seal of approval, and (2) taking any action in respect to the advertising used by plaintiff in connection with the exhibition of said motion picture.

The complaint states two claims. The first is that defendant, a voluntary membership corporation, is composed of the major producing and distributing companies in the United States, and has a close and effective working relationship with all but 5% of the remaining producing, distributing and exhibiting companies in the motion picture industry, all of whom comprise more than 95% of the producers, distributors and exhibitors in the industry. Under its constitution and by-laws, there has been created within its organization, a Production Code Administration and an Advertising Code Administration, alphabetically designated PCA and ACA, to impose upon production and distribution of motion pictures a system of censorship according to the terms of their respective codes. The PCA requires the submission of a completed film to it for approval, and when required deletions and changes have been made, issues its seal of approval. Non-member cooperating affiliated producers may also submit their pictures to the PCA for the same purpose and with the same result. The right to void the seal and to require its immediate surrender is granted to the defendant for any violation of the conditions under which it is issued. One of the conditions is that all advertising material used in exploiting motion pictures shall be submitted to the ACA for approval. The provisions of the code shall be applied to all advertising material submitted, with scrupulous fairness, equality and impartiality, and an appeal is permitted to the president of the defendant from a decision of the Administrator of the ACA rejecting submitted material.

It is further alleged that the defendant by its rigid control over the supply of motion pictures, has compelled more than 90% of the exhibiting theatres within the United States to exhibit only "sealed" pictures and no others, and to refuse to exhibit "unsealed" pictures under economic coercion and threat of having their supply of "sealed" pictures entirely shut off, in consequence of which more than 90% of all exhibiting theatres refuse to exhibit pictures which do not have defendant's seal.

It is further alleged that plaintiff's motion picture department, under the name of "Hughes Productions," is a member in good standing of the defendant, is bound by its constitution, by-laws and regulations, in respect to all pictures it produces, by the conditions under which the seal of approval is granted, and that all advertising and publicity material used in publicizing its pictures must be submitted to the ACA for approval.

In 1941, plaintiff produced "The Outlaw," submitted it to the PCA for a seal, and such a seal was issued on May 23, 1941, after certain frames had been trimmed from the picture. In 1945 plaintiff contracted with the United Artists Corporation, distributor and former member of the defendant, for the general public release of "The Outlaw," under a contract which required plaintiff to deliver to United Artists the motion picture, "and as a condition precedent to the delivery will have procured a seal" from the defendant.

The advertising campaign material caused to be prepared by plaintiff was submitted to the ACA for approval between November 1945 and February 1946, and it rejected an outdoor poster, a number of pen and ink drawings, and six photographs. Plaintiff appealed to the defendant's president, who, on March 29, 1946, affirmed the rejection of the bulk of the material except as to the photographs.

It is further alleged that the resolutions establishing the ACA are unlawful, coercive and ineffective as an improper delegation of authority by defendant's board of directors; and in that they afford no adequate appeal from the capricious, discriminatory and unreasonable rejection of its advertising; by reason of all of which plaintiff has been deprived of its property without due process of law.

Plaintiff further claims that it has been damaged by the discrimination, arbitrary action, and total lack of impartiality of the ACA and the president; and that the rejection of certain advertising, referring to

prior censorship difficulties with local authorities, was unlawful and in violation of the First Amendment to the Constitution of the United States. Because of the rejection of this advertising, plaintiff states it has been greatly damaged in the sum of $1,000,000.

The second claim set forth is framed under the Sherman Anti-Trust Act, 15 U.S. C.A. §§ 1–7, 15 note. It is alleged that the defendant and its members (of which plaintiff was one) entered into an agreement and conspiracy to hinder and suppress competition in the interstate sale, distribution and showing of motion picture films, and to create a monopoly in the production and distribution of motion pictures of members and cooperating affiliated non-members; and by reason of the economic control centered in the seal, they have coerced and compelled a virtual totality of motion picture producers to submit all stories, scripts, and completed motion picture films and their titles, to its PCA for seal of approval, without which motion picture films cannot be shown in more than 90% of the motion picture theatres; by means of which producers are compelled to avoid controversial film treatment of social, political, economic, educational and public matters of importance, in contravention of the guarantee of free speech contained in the First Amendment of the Constitution of the United States; and in compelling all advertising matter used in the exploitation of motion pictures to conform to specific standards adopted and enforced by the defendant.

It is claimed that as a result of such combination and conspiracy, there is withheld from the public a large body of information, knowledge and understanding of such controversial topics against the wishes of individual producers, distributors and exhibitors, and to the great detriment of the public; owners of motion picture theatres are compelled to refuse to accept any pictures for exhibition which do not bear the seal of approval; all non-member producers are compelled to obtain a seal under economic threat of finding more than 90% of the theatres barred to them; producers, distributors and exhibitors are compelled to conform their advertising to defendant's arbitrary, discriminatory and preconceived notions of public propriety; a private censorship is imposed upon the industry, by which defendant has assumed quasi-governmental functions and police powers which may properly be exercised only by governmental agencies; and the legitimate business of many independent producers, distributors and exhibitors have been restrained and controlled, in violation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, and Clayton Act, 38 Stat. 730, by reason of defendant's group boycott of producers, distributors and exhibitors, who do not obtain the seal of approval.

These, it is claimed, subject plaintiff to the penalty of revocation of the seal for the use of any rejected advertising material, and thus cause a breach of plaintiff's contract with United Artists, and restrain the effective distribution of "The Outlaw." It is further claimed that the system of private censorship thus imposed is unconstitutional and unlawful in that the by-laws and regulations are arbitrary and discriminatory and afford no fair, lawful or adequate trial or appeal, thus depriving plaintiff of his property rights without due process; and the banning by defendant of the film treatment of certain controversial topics and the prohibition of certain advertising and mention of prior censorship constitute a continuing conspiracy in violation of plaintiff's rights guaranteed by the First Amendment. It asks damages in the sum of $5,000,000.

These broad allegations have not been sustained by proof of facts.

"The Outlaw" is claimed to be a story built on the saga of Billy the Kid, and apparently is a glorified "Western," featuring to some extent the escapades of Billy, and those of a tough girl Rio, in a western frontier town, who uses, among other attractions, a gun and a pitchfork with considerable lethal intent.

In 1940 the final shooting script of the picture was submitted to the PCA and a number of suggestions as to changes were accepted. The finished picture was presented in March, 1941, other suggestions were made and in part adopted, but the deletions were still insufficient to bring the

picture in conformity with the production code, and defendant refused to issue a certificate of approval. Appeal was taken to defendant's board of directors, and after repeated screening in the presence of the board and the removal of additional footage from the controversial scenes, it was agreed between the parties that, upon the excision of additional footage, the certificate of approval would issue. On May 23, 1941, that was done, and the certificate provided in part:

"Dear Mr. Hughes:

"The attached certificate of approval is issued, upon the condition that its acceptance by you, binds you, as producer, and/or your distributor, and any and all other agents of yours, and your assigns, and successors, to the following terms and conditions: * * * *

"(3) That any and all advertising and publicity matter, including material for press books, still photographs, poster and lobby card designs, and trailers, used in any manner in connection with the advertising and exploitation of this picture, shall be submitted for approval to the Advertising Advisory Council of the Motion Picture Producers and Distributors of America, Inc., and that only such advertising or publicity material or trailers, approved by such Council shall be used in advertising and exploiting the picture hereby approved, and

"(4) That, in addition to any other applicable penalties, the Production Code Administration reserves the right to void this Certificate, at any time hereafter, for any violation of the conditions set forth herein and/or of the violation of any of the rules and regulations promulgated by the Board of Directors of the Motion Picture Producers & Distributors of America, Inc."

The crux of the present dispute is a narrow one, and relates only to the alleged rejection of certain advertising matter which plaintiff's president describes as "only a small portion of the advertising with which the film is to be launched."

Plaintiff's papers reveal that it has not complied with the terms of the certificate in so far as advertising is concerned. In 1943, at San Francisco, the advertising, which had not even been submitted to defendant, was of such a character as to incur the condemnation of public authorities and its consequent withdrawal. Other undenied instances are shown which reveal that plaintiff's president has sought and still seeks to arrogate to himself the decision of what advertising should be indulged in, regardless of the contract above quoted, and of the rules and regulations of the association of which his production company was a member.

The advertising now in controversy in substance consists of pictures, cuts, and lithographs of the lady Rio, featuring more her breasts, legs and positions than the saga of Billy the Kid, and using the words "Exactly as it was filmed—Not a Scene Cut."

This advertising was submitted by plaintiff to the ACA for approval in December 1945. It consisted of still photographs, newspaper advertising, and art work for proposed posters. There were 202 stills submitted, 187 were approved, 1 was rejected and the remaining 14 were returned for retouching. Plaintiff appeals with respect to only 6 of these 14, and defendant's president reversed the decision of the Administrator of the ACA, and they are no longer the subject of discussion.

Twenty-six newspaper advertisements were approved. As to 20 others which were returned for correction, plaintiff appealed and the rejection was sustained. Eight of the advertisements were pen and ink drawings, in which the breasts of the star were emphasized and exposed. The Administrator of the ACA suggested that these drawings could be rendered unobjectionable by a slight retouching, that is, by the raising of the blouse a fraction of an inch, which plaintiff refused to do. Others were rejected because they showed a man and woman together in hay in a compromising horizontal position. Another was rejected because it exposed too much bosom and carried the line: "What are the two great reasons for Jane Russell's rise to stardom?" Eleven others were rejected because they contained what the Administrator terms was a false and misleading statement—"Exactly as filmed—not a scene

cut." Four others were rejected because they contained the word "censored" displayed across the figure of the star ,with her anatomy exposed. There was also rejected the use of a type line, "How would you like to tussle with Russell?" These rejections were all sustained on appeal to defendant's president.

A photostat of a painting of the star, from which it was proposed to prepare a poster 8'8" x 14'5" was submitted, and after it was retouched, was accepted. Later finished posters were submitted, which the Administrator states did not reproduce the painting but knowingly and indecently emphasized the star's breasts, they were rejected, and the rejection sustained on appeal.

Since these rejections and the appeal therefrom, and prior to the commencement of this action, plaintiff's advertising agent has submitted 8 additional newspaper advertisements, which have been approved; and United Artists, its distributing agent, has submitted 11 pages of material for a "press book" and various other pieces of miscellaneous display material, all of which have been approved.

It is further shown, without dispute, that plaintiff is now using not only rejected advertising material, but also material which has never been submitted to the defendant, both in newspapers and on sign displays, and has even released the picture which caused trouble for it in San Francisco in 1943. Late in April, 1946, it is alleged, and not denied, a sky-writing airplane wrote the words "The Outlaw" in the sky over Pasadena, and then made two enormous circles with a dot in the middle of each.

The appeal from the action of the Administrator of the ACA, was to defendant's president in accordance with its by-laws. Upon that appeal, plaintiff was represented by counsel, and had full opportunity to present its argument and contentions.

■ It is not necessary for a determination of this motion that I pass upon whether or not the rejections of the advertisements because of the exposure of too much anatomy, or because of the use of the expressions mentioned, were wrong or otherwise. They certainly were not arbitrary or discriminatory. Concededly, one of the purposes for which defendant was organized was to establish and maintain the highest possible moral and artistic standards in motion picture production. That was in part in response to objections voiced in press and otherwise throughout the United States to the kind of pictures which appeared from time to time in the theatres, and to some of the advertisements used in the promotion of pictures. I shall not interfere with the carrying out of that purpose, particularly in favor of ·one whose sole object is a selfish one.

Nor will I hold that the processes offered by .defendant for submission to it of proposed advertising, and for its examination and approval or rejection, are of such a character that they do not present a fair opportunity for consideration, honest decision, and full and complete representation, nor that such trial and appeal were either perfunctory, useless or illusory. The results obtained by plaintiff as to this very picture completely disprove any such contention. The seal of approval was granted liberally, it now appears. Governmental authorities in several communities subsequently required further deletions. And the disapproval of pictures of the star was not final; they were returned for correction. There is no evidence of discrimination against plaintiff. If anything, there is shown a desire to cooperate. That plaintiff's president was not satisfied with the results proves nothing other than that he would not be satisfied unless he had all of his own way.

■ As to the use of the words, "Exactly as it was filmed—not a scene cut," I can see no fair reason for interfering with their rejection. They are not true. Even if plaintiff in this case is in a position to invoke the First Amendment relating to freedom of speech, and of that I have grave doubt, he can hardly succeed where the speech which has been rejected is not the truth. It is shown without dispute, both by plaintiff's own affidavit as well as by those submitted in opposition to this motion, that after the completed film was submitted to the defendant in 1941, prior and subsequent to which portions of the original film had been .cut at defendant's request,

deletions were required and made of additional objectionable footage and dialogue by censoring authorities in New York, Pennsylvania, Ohio, Maryland, Massachusetts, San Francisco and Chicago.

Plaintiff alleges that its inability to use these words, which it claims is a vital part of his advertising campaign, will cause him great loss. The papers submitted do not bear this out. It does not appear that the raising of the blouse or the lowering of the skirt on the star a small fraction of an inch, or the correction of the recumbent position of the man and woman, or the elimination of the words relating to censorship, will so terribly affect plaintiff's box office receipts. To the contrary, the papers show that in Richmond and Norfolk, Virginia and Atlanta, Georgia, where Loews refused to use the objectionable advertising submitted by plaintiff, plaintiff's own claim is that the showing of "The Outlaw" broke all box office records.

Plaintiff asks the court to restrain defendant from interfering with its right to publish the truth. A necessary basis for any such restraint would be that he is seeking to publish the truth. The defendant does not here seek to invade the plaintiff's right of free speech and press. It seeks only to deny plaintiff's right to do whatever he sees fit under the defendant's seal of approval. If plaintiff insists upon its so-called rights, whatever they may be, it may do so; but it cannot insist that it do it with defendant's approval, or under conditions which the public may believe is with the defendant's approval.

There is not shown here any refusal or threatened refusal on the part of any exhibitor to exhibit without the seal. There is not shown here the refusal on the part of any distributor to distribute without the seal. Plaintiff already has distribution and exhibition. Not one instance is shown where either distribution or exhibition has been refused because of the absence of a seal, or because a seal once granted has been cancelled. Plaintiff's distributor, the United Artists, is not a member of the defendant and is not bound by its rules. And the papers submitted show beyond any question of a doubt that many pictures without the defendant's seal are being exhibited throughout the country.

Plaintiff's real complaint seems to be that because he claims to have invested $2,000,000, and that "The Outlaw" is the only picture which it has produced since 1941 and its entire status as a producer is at stake on this one production, the defendant's "threat (which the papers show it has not made) to revoke the seal" must be gauged on the basis of the financial loss that may be involved and of plaintiff's capacity to go on producing motion pictures. It overlooks the fact that all of this danger, if any there may be, is being caused by its obvious and admitted violation of its contract with the defendant. It is perfectly willing to accept the benefit of the seal which it says will give it entry into all of the 18,000 theatres in the United States, but is is not willing to accept the conditions under which it may operate with the seal. That part of its contract which will result in profit to it is good; that part which requires it to restrain its advertising is bad. I know of no law which authorizes a party to accept the good in a contract and reject what he does not like. It cannot have its cake and eat it too. If it wishes to retain the seal, it must be on the condition that it adhere to the agreement under which it holds and has used it.

This would only seem to be fair and equitable to the defendant, organized in part, to the knowledge of the motion picture public, to keep pictures decent and morally acceptable. By the issuance of its seal, which is shown on every motion picture approved by it, the public is led to understand that that picture has defendant's approval. In addition, the picture being approved, the public may properly assume that the advertisement and promotional matter of the picture is likewise approved. The blame for improper, salacious or false advertisement is, therefore, placed as much at the door of the defendant as of the producer. There is no reason for subjecting the defendant to this criticism caused solely by the action and arbitrary conduct of the plaintiff.

This motion is denied for the following reasons; among others:

1. The agreement under which plaintiff holds the seal is the beginning and end of this controversy. It is either wholly good or wholly bad. If it is good, plaintiff cannot retain part and reject the balance. Certainly it is not unilateral.

2. If it is bad because defendant allegedly is engaged in a combination in violation of the Sherman Act, then this court should not lend its injunctive process to uphold any part of it.

■ 3. That some of the defendant's members, who distribute motion pictures, have agreed that they will not "release, distribute or promote the release or distribution or in any way, directly or indirectly, make available for release or distribution, any motion picture which has not theretofore been approved," is not, in my opinion, a violation of the Act. The purpose of the approval is in furtherance of the proper purpose of the defendant to censor pictures which it may consider are not up to the highest possible moral and artistic standards. Defendant, I believe, owes that duty to the public. Even if it does not, it holds itself out as so doing, and the obligation is the same. If there is any restraint in such a proper purpose, it is a reasonable one.

■ 4. The contract under which the seal of approval was granted, and upon which plaintiff now so strenuously relies, is not inherently invalid or illegal. That being so, it is enforcible, even though one of the parties to it is violating the Sherman Act. Connolly v. Union Sewer Pipe Co. 184 U.S. 540, 549, 551, 22 S.Ct. 431, 46 L. Ed. 679; Small Co. v. Lamborn & Co., 267 U.S. 248-252, 45 S.Ct. 300, 69 L.Ed. 597; The Charles E. Wisewall, D.C., 74 F. 802; Standard Oil Co. v. Markham, D.C., 61 F. Supp. 813-815.

■ 5. However, if the seal contract can be said to be illegal because of the alleged illegal character of the defendant and the alleged combination and conspiracy among its members, plaintiff cannot in the same breath enforce it and attack it. Both parties to it would seem to be in pari delicto, and in such a case, the court will not lend its aid to either; it will leave them as it finds them. Northwestern Oil Co. v. Socony Vacuum Oil Co., 7 Cir., 138 F.2d 967-

971, certiorari denied 321 U.S. 792, 64 S. Ct. 790, 88 L.Ed. 1081; Eastman Kodak Co. v. Blackmore, 2 Cir., 277 F. 694-698. This principle, of course, would have no application if it may be said that plaintiff in entering into the contract was laboring under economic compulsion or duress, as it is called. But I find no evidence of that.

■ 6. That there may some time be a violation of the Sherman Act, either by a combination of the defendant and its members to prohibit exhibition or distribution of plaintiff's picture, or because of the agreements between the distributor members above quoted, that they will not distribute or aid in the distribution of unsealed pictures, does not, in my opinion, affect the present question. Those possible acts, anticipated by plaintiff, have done nothing to bring about the present controversy. It arises solely by reason of the seal agreement and plaintiff's conduct with reference thereto. The violation of the Sherman Act, if any, in other words, is not the cause nor the means by which this case has been brought about. The violation has not occurred, nor damaged plaintiff in any respect, which would seem to be a pre-requisite to enable plaintiff to recover under the provisions of that law. Title 15 U.S. C.A. § 15. The possibility of damage in the future is most speculative; plaintiff's picture has been produced, distributed, and is now being exhibited. No alleged violation of the Sherman Act has caused the situation now confronting the court. No combination or conspiracy in which the defendant is involved produced it. It arises only from the relationship between plaintiff and defendant, crystalized in the contract between the two of them. Defendant has not breached that contract, and there is no evidence that it intends to do so. Before plaintiff could suffer any damage under the facts shown here, there must occur at least two further acts—a cancellation of the seal, and an exclusion from exhibition, or a cancellation by the United Artists of its distributing contract. Even if the latter should occur, there are, so the papers show, at least three other distributors who are not members of the defendant.

7. The situation in which plaintiff finds itself can be remedied in two ways. This

court may grant the injunction sought, which will either perpetuate an illegal contract, or permit plaintiff to enforce what he likes and reject the balance. This will hold out to the public the approval by the defendant of something it does not approve.

Or it may be remedied by plaintiff doing what it contracted to do. I cannot see any reason why this court should do an inequity to satisfy one who clearly violates its contract. I cannot bring myself to believe that the defendant· will cancel its seal if the plaintiff carries out fairly its part.

8. This entire controversy has been precipitated by the act of plaintiff. It has not only violated the terms under which it obtained the seal, both before and since the submission of the disputed advertising to the defendant, but it claims the right so to do, even though it requires the recognition of another part of the contract it is violating. Its compliance with the contract does not involve very much on its part. An examination of the various exhibits persuades me that the whole matter is a trivial one, a tempest in a teapot. In fact, it seems more an effort on the part of the plaintiff to add this case and its peregrinations through the courts as additional publicity and advertising in promotion of the picture.

9. Finally, it is contended that, "So long as the illegal combination and present use of the seal persists, plaintiff is bound * * * to make every effort to retain the seal. * * * When, upon final decision of the merits of the suit, * * * the use of the seal as the mechanism of the unlawful combination is terminated, the economic coercion to which plaintiff is now subject will be at an end. Plaintiff will then be free * * * to compete in the motion picture field unrestricted by the need to conform to defendant's seal requirements. Only then is it right to require the surrender of the seal. Until then to penalize plaintiff for refusing to do so is the equivalent of depriving it of the protection of the anti-trust laws."

If the seal will not be required at the end of this litigation, why is it required now? The conclusion to be drawn is obvious. Plaintiff obviously wants to prolong the present status until its picture has run its life, it will have received the profit from its exhibitions, and will no longer require the seal; and all this in opposition to defendant, under its seal of approval, and in violation of its contract. That is too naive. If plaintiff wishes to retain the seal of approval, it must comply with its agreement and with the conditions upon which the seal was granted.

The motion is, therefore, denied, and the stay granted by Judge Leibell vacated. Settle order on notice.